NO.  23-11899-E

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

JEREMY HITT,

*Plaintiff/Appellant*,

**vs.**

CSX TRANSPORTATION, INC.,

*Defendant/Appellee*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
HONORABLE R. DAVID PROCTOR
(2:21-CV-01720-RDP)

**APPENDIX TO INITIAL BRIEF OF APPELLANT
VOLUME VII**

FRANK TUCKER BURGE, JR.
FRANK TUCKER BURGE, SR.
BURGE & BURGE, P.C.
2001 Park Place, Suite 1350
Birmingham, AL   35203
(205)251-9000
(205)323-0512 (Facsimile)
*Counsel for Plaintiff/Appellant Jeremy Hitt*

# INDEX OF APPENDIX

## VOLUME I

| Docket/Tab# | DATE | TITLE |
|---|---|---|
| A | | United States District Court Docket Sheet |
| 1 | 12/29/2021 | Complaint |
| 6 | 02/28/2022 | Defendant's Answer to Complaint |
| 26 | 01/31/2023 | Defendant CSX Transportation, Inc.'s Motion for Summary Judgment |
| 27 | 01/31/2023 | Defendant CSX Transportation, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment |
| 31 | 02/03/2023 | Defendant CSX Transportation, Inc.'s Amended Evidentiary Submission in Support of Its Motion for Summary Judgment |
| 31-2 | 02/03/2023 | Exhibit B - Declaration of Michael Dilday |
| 31-3 | 02/03/2023 | Exhibit C - Declaration of Katrina Donovan |

## VOLUME II

| Docket/Tab# | DATE | TITLE |
|---|---|---|
| 31-8 | 02/03/2023 | Exhibit E - Declaration of John Layne |
| 31-13 | 02/03/2023 | Exhibit J - Deposition of Jeremy Hitt and Selected Exhibits |
| 31-15 | 02/03/2023 | Exhibit L - September 7, 2021 Deposition of Nick Smith |

1

| 32 | 02/07/2023 | Defendant CSX Transportation, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment |

## VOLUME III

| Docket/Tab# | DATE | TITLE |
| --- | --- | --- |
| 35 | 02/27/2023 | Plaintiff's Evidentiary Material in Opposition to Defendant's Motion for Summary Judgment |
| 35-1 | 02/27/2023 | Exhibit A - Disciplinary Hearing Transcript with Exhibits 01/30/2019 |
| 35-2 | 02/27/2023 | Exhibit B - Jason Erik Crawford Deposition Transcript |
| 35-3 | 02/27/2023 | Exhibit C - Jeremy Hitt Deposition Transcript |
| 35-4 | 02/27/2023 | Exhibit D - Juston Roper Declaration |
| 35-5 | 02/27/2023 | Exhibit E - Jeremy Hitt Declaration |

## VOLUME IV

| Docket/Tab# | DATE | TITLE |
| --- | --- | --- |
| 35-6 | 02/27/2023 | Exhibit F - Josh Hiers Deposition (Individual) |
| 35-7 | 02/27/2023 | Exhibit G - Disciplinary Hearing Transcript with Exhibits 01/17/2019 |
| 35-8 | 02/27/2023 | Exhibit H - Ronnie Head Declaration |
| 35-9 | 02/27/2023 | Exhibit I - CSX's Responses to Interrogatories 08/13/2021 |
| 35-10 | 02/27/2023 | Exhibit J - Toni Eady Deposition Rule 30(b)(6) Designee with Exhibits 2, 5, 7, 9 and 10 |

## VOLUME V

| Docket/Tab# | DATE | TITLE |
|---|---|---|
| 35-11 | 02/27/2023 | Exhibit K - Joseph Whitt Deposition Rule 30(b)(6) Designee with Exhibits PX03, PX05, PX06 |
| 35-12 | 02/27/2023 | Exhibit L - Nick Smith Deposition I with Exhibits 1 and 5 09/07/2021 |
| 35-13 | 02/27/2023 | Exhibit M - Nick Smith Deposition II with Exhibit 3 12/14/2022 |

## VOLUME VI

| Docket/Tab# | DATE | TITLE |
|---|---|---|
| 35-16 | 02/27/2023 | Exhibit P - Juston Roper Deposition |
| 35-17 | 02/27/2023 | Exhibit Q - Alan Pledger Deposition |
| 35-18 | 02/27/2023 | Exhibit R - Josh Hiers Deposition Rule 30(b)(6) Designee |
| 35-20 | 02/27/2023 | Exhibit T - Nick Smith OPTS Records January 2017-January 2019 CSX_HITT_002713-002791 |
| 35-21 | 02/27/2023 | Exhibit U - Donovan Boyles Deposition Rule 30(b)(6) Designee with Exhibit PX 2 |

## VOLUME VII

| Docket/Tab# | DATE | TITLE |
|---|---|---|
| 38 | 02/28/2023 | Plaintiff Jeremy Hitt's Response in Opposition to Defendant's Motion for Summary Judgment |

| 44 | 03/21/2023 | Defendant CSX Transportation, Inc.'s Reply to Plaintiff's Summary Judgment Opposition |
| 45 | 05/11/2023 | Memorandum Opinion |
| 46 | 05/11/2023 | Order |
| 49 | 06/06/2023 | Notice of Appeal |

**BURGE & BURGE, P.C.**

/s/ F. TUCKER BURGE, JR.
F. TUCKER BURGE, JR.

/s/ F. TUCKER BURGE, SR.
F. TUCKER BURGE, SR.
2001 Park Place, Suite 1350
Birmingham, AL   35203
(205) 251-9000
(205)323-0512 (Facsimile)
Email: ftbjr@burge-law.com
Email:  tucker@burge-law.com

ATTORNEYS FOR PLAINTIFF/APPELLANT
JEREMY HITT

## **PROOF OF SERVICE**

I hereby certify that on the 31ˢᵗ day of August, 2023, I electronically filed the above and foregoing document with The Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF systems which will send notification of such filing to the following:

## **SERVICE LIST**

Morris Wade Richardson
RichardsonClement P.C.
22 Inverness Center Parkway, Suite 500
Birmingham, AL 35242

Thomas R. Chiavetta, Jr.
Troy Mattila
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001.

/s/ F. TUCKER BURGE, JR.
F. TUCKER BURGE, JR.

DOCKET/TAB #

38

FILED

2023 Feb-28  PM 10:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEREMY HITT,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) | |
| | ) | **2:21-cv-1720-RDP** |
| **vs.** | ) | |
| | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF JEREMY HITT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**F. TUCKER BURGE, JR.**
ftbjr@burge-law.com
**F. TUCKER BURGE, SR.**
tucker@burge-law.com
**BURGE & BURGE, P.C.**
**2001 Park Place, Suite 1350**
**Birmingham, AL   35203**
**(205)251-9000**
**(205)323-0512 (Facsimile)**

**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

RESPONSE TO DEFENDANT'S STATEMENT OF FACTS . . . . . . . . . . . . . . .   1

STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . .   14

    A.    The Work, Training, and Supervision of Remote
           Control Operators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    B.    CSX Emergency and Banner Test Rules . . . . . . . . . . . . . . . . . . . . .   14

    C.    The Role and Training of Trainmasters . . . . . . . . . . . . . . . . . . . . . .   15

    D.    The Securement Charge Puts Hitt in Step 2
           of IDPAP Progressive Discipline Process . . . . . . . . . . . . . . . . . . . . .   17

    E.    The "Tough" Banner Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

FRSA LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

    A.    Plaintiff Can Establish a Prima Facie Case
           of Retaliation under the FRSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

         1.    Contributing Factor Standard . . . . . . . . . . . . . . . . . . . . . . . .   27

         2.    Contributing Factor Analysis . . . . . . . . . . . . . . . . . . . . . . . .   29

         3.    Temporal Proximity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

         4.    Hostility Toward Protected Activity . . . . . . . . . . . . . . . . . . .   31

         5.    Indications of Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

         6.    Employer Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

    B.    CSX Cannot Satisfy the Affirmative Defense . . . . . . . . . . . . . . . . .   36

i

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

## INTRODUCTION

This action is brought under the anti-retaliation provisions of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, which were enacted "to ensure that employees can report their concerns without fear of possible retaliation or discrimination from employers." *Araujo v. N. J. Transit*, 708 F.3d 152, 157, n.3 (3rd Cir. 2013) (quoting H.R. Rep. No. 110-259 at 348 (2007) (Conf. Rep.), 2007 U.S.C.C.A.N. 119, 181). Viewed in the light most favorable to the Plaintiff, the evidence and inferences support the Plaintiff's claim that CSX retaliated against him for speaking out against and refusing to engage in a work practice that he believed to be unsafe and contrary to his federal certification training. A reasonable fact-finder could conclude that Plaintiff's FRSA protected activities contributed to the adverse actions taken against him and that Defendant would not have taken these adverse actions in the absence of his protected activities. Therefore, Plaintiff respectfully submits that Defendant's Motion is due to be denied.

## RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.      Undisputed.

2.      Disputed that  Hitt worked continuously for CSX between 2005 and 2019. Between late 2011 and 2014, Hitt was terminated from CSX under circumstances that were the subject of his previous FRSA case, claiming that he was targeted for refusal to exceed 7 mph when switching.  (Doc. 1, Complaint, ¶ 8; doc. 2, Answer, ¶ 8.)

3.      Undisputed.

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Disputed that the restricted speed limit at Boyles Yard was 10 Mph at the time and place the January 21, 2019, banner test. CSX issued a division bulletin on December 28, 2018, modifying Operating Rule 300.4 to increase the restricted speed limits at Boyles Yard. (Ex. A, Hearing Tr. 38:5-39:35; Ex. A, pp. 71-73.)  The bulletin increased the restricted speed limit in the departure yard where the January 21, 2019, banner test occurred to 15 mph.  (Id.)

8.      Disputed as to the second sentence.  Management instructed at least one RCO, Erik Crawford, to exceed the restricted speed limit of 10 mph.  (Ex. B, Crawford Tr. 103:2-12, 104:1-2.)  Mr. Crawford complied with the instruction.  (Id. at 104:8-17.)  As to the third sentence, RCOs at Boyles Yard understood the instruction to "work faster" was to operate their equipment at the maximum restricted speed because that was the only speed higher than 7 mph. (Ex. C, Hitt Tr. 40:18-41:21; Ex. D, Roper Dec. ¶ 2.)  At the time of the relevant events, CSX was implementing its Precision Railroading business model, which had resulted in job cuts and fewer workers in the yard.  (Ex. B, Crawford Tr. 103:2-16.)  To keep up with production demands, RCOs were instructed to run "wide open," *i.e.*, at the maximum restricted speed.  (Id. 103:2-18.)

9.      Disputed that the lightning incident occurred in January 2018.  CSX deposed  Hitt in the ALJ proceedings preceding the filing of this lawsuit, and  Hitt testified that the lightning incident occurred in the summer of 2018.  (Ex. C, Hitt Tr. 19:12-20:1.)[1]  It is further disputed that CSX "does not have any explicit rules regarding lightning storms."   Hitt testified that CSX released a summer rule pamphlet on safety hazards that arose most frequently during the summer,

_____

[1]

    CSX cites the Complaint for the proposition that the lightning incident occurred in January 2018.  The Complaint, however, generally alleges that the lightning incident happened "a year before" the January 21, 2019, banner test.  (Doc. 1, ¶ 14.)  It does not say that the lightning incident occurred in January 2018.

such as dehydration and lightning storms. (Id. 20:18-21:6.)  The pamphlet contained the rule about remaining inside until 30 minutes after the last lightning strike.  (Id.)

10.     Undisputed.

11.     Disputed as incomplete.   Trainmaster Smith ordered  Hitt and the others taking shelter to return to work during the second call.  (Id. 27:9-14.)

12.     The third call occurred 10-15 minutes after the second call—not the first.  (Id. 27:15-20.)  Trainmaster Smith was angry at  Hitt at this point for refusing work in the lightning storm.  (Ex. E, Hitt Dec., at ¶ 6.)

13.     Disputed as incomplete.  Smith was angry during the encounter.  (Hitt Dec., ¶ 6.) Furthermore, in response to Trainmaster Smith's threat to relieve  Hitt of duty,  Hitt responded, "You do whatever you need to do, but we have 15 minutes until it's safe to go back out per the rule." (Ex. C, Hitt Tr. 31:5-32:4.)  Trainmaster Smith never disputed  Hitt's understanding of CSX's rule regarding working in lightning storms.  (Id.)

14.     Disputed that Trainmaster Smith did not take exception to  Hitt operating at 7 mph after returning to work.   Hitt testified that Trainmaster Smith "wasn't out there" when he returned to work.  (Id. 37:20-38:1.)

15.     Undisputed.

16.     Disputed that this interaction with Trainmaster Josh Hiers happened "a couple months" after January 2018.  The evidence that CSX relies on for this proposition is  Hitt's deposition testimony.   Hitt, however, testified that the lightning incident occurred in the summer of 2018 and that this interaction occurred "a couple of months later."  (Id. 19:12-20:1, 38:10-18.) Furthermore, Josh Hiers was not working at Boyles Yard "a couple months" after January 2018.

He became a Boyles Yard trainmaster in May 2018.  (Ex. F, Hiers Tr. 8:14-9:15.)  Before that, he

was a yardmaster in Savannah, Georgia.  (Id.)

17.    Disputed that  Hitt was working "on a one-man crew."  CSX employee J.C.

Corneglio was working as a utility man on  Hitt's crew that day.  (Ex. G, Hearing Tr. 20:28-37,

22:24-30; 26:4-15.)

18.    Undisputed.

19.    Undisputed with clarification.   Hitt and Mr. Corneglio were working on the

ground off the locomotive at the time  Hitt experienced the bathroom emergency.  (Ex. C, Hitt

Tr. at 64:18-66:5, 69:18-22.)  They had just finished applying the handbrakes to the cut of cars

that they planned to leave in the track.  (Id.)  When the bathroom emergency occurred,  Hitt

secured the handbrake on the locomotive with his remote control box (the equivalent of putting a

car in park) and disabled the remote control box by turning it off. (Id. 64:18-66:5, 72:9-11.)  Mr.

Corneglio then drove  Hitt to a nearby bathroom in a company Suburban used by Boyles Yard

utility men.  (Id. 70:20-71:1.)  Securing the locomotive in accordance with CSX rules would

have required  Hitt or Mr. Corneglio to climb aboard the locomotive and turn the "start/stop

isolate switch" into the Isolate position (which disables the controls in the locomotive) and turn

the generator field switch off (which prevents the engine from "revving up").  (Id. at 73:17-74:7.)

Hitt did not think he could climb aboard the locomotive and perform these steps without

defecating himself.  (Ex. C, Hitt Tr. 64:18-66:5, 73:20-74:7.)

20.    Disputed as incomplete.   Hitt told the yardmaster that he had a bathroom

emergency. (Id. 152:20-153:1.)

21.    Disputed to the extent CSX implies that Trainmaster Hiers came upon  Hitt's

locomotive by happenstance.  Trainmaster Hiers was a Boyles Yard trainmaster. (Ex. F, Hiers Tr.

14:5-8.)   He "constantly" monitored the yard employees under his supervision.  (Id. 19:1-10.)

He spent most of the work day with the yardmaster listening to the movements in the yard.  (Id.

24:21-25:20.)  He also monitored employees through a camera system in his office, where he

could watch the employees from one of the 40 cameras set up at Boyles Yard.  (Id. 21:19-24:12.)

Trainmaster Hiers had a radio in his truck and typically carried a handheld radio.  (Id. 21:13-18)

It can be reasonably inferred that Trainmaster Hiers overheard  Hitt report his bathroom

emergency to the yardmaster and that Hiers went to the locomotive to check to see if it was fully

secured.

22.     Undisputed.

23.     Disputed as incomplete.   Hitt told Trainmaster Hiers that his stomach was

bothering him to a point that he feared defecating on himself.  (Ex. G, Hearing Tr. 17:12-21.)

24.     Undisputed.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     The second sentence is disputed as misleading.  The CSX manager who testifies

about the basis of the charge at the hearing – known as the charging officer – is typically the

manager who charged the employee with the rule violation.  (Ex. H, Head Dec. ¶ 7.)

29.     Disputed to the extent CSX implies that the employees's right to appeal his

discipline to an arbitration panel is relevant, for the reasons stated in response to Paragraph 39 of

CSX's Statement of Undisputed Material Facts, *infra*.

30.     Clarified that Trainmaster Hiers was the CSX manager who charged  Hitt for

failing to fully secure the locomotive.  (Ex. I, CSX Ans. to Interrog., p. 3.)

31.     Undisputed.

32.     Clarified that  Hitt declined signing the waiver because he believed that the

circumstances called for leniency.  (Ex. C, Hitt Tr. 17-81:8.)

33.     Undisputed.

34.     Undisputed with clarification.  Trainmaster Smith wrote nothing in the section of

the Hearing Officer Findings for mitigating factors and "any evidence . . . which would cause

leniency."  (CSX Ex. B, doc. 31-2, at p. 67.)

35.     Undisputed.

36.     Undisputed.

37.     Undisputed.

38.     Disputed that an arbitrator's decision is relevant in an FRSA case.  Arbitration

panels are tasked with deciding whether employees violated an employer's workplace rules;

whereas, the jury will be asked whether CSX violated the FRSA.  *See*, *e.g.*, *Ray v. Union Pac.*

*R.R. Co.*, 971 F. Supp. 2d 869, 885 n.19 & 893 (S.D. Iowa 2013); *James v. CSX Transp. Inc.*, No.

4:15-CV-204 (CDL), 2017 U.S. Dist. LEXIS 143640, at *37 (M.D. Ga. Feb. 21, 2017).  In

addition to arbitration panels not addressing the issues related to FRSA plaintiffs' retaliation

claims, arbitration panels limit their review to "the record created in the railroad-controlled

investigative hearing," *Kulavic v. Chicago & Illinois Midland Ry. Co.*, 1 F.3d 507, 517 (7th Cir.

1993), and review the discipline under the highly-deferential "substantial evidence" standard.

(CSX Ex. C, doc. 31-3, p. 31.)  "Substantial evidence" is defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." (Ex. J, Eady (30(b)(6)) Tr.

61:8-62:23.)  Thus, unless no reasonable mind might accept the evidence in the hearing record as

supporting the rule violation, the arbitration panel will uphold the discipline on substantive grounds.

39.     Disputed as misleading. Federal law requires railroads to perform periodic operational tests and observations of its employees for compliance with operating rules. (Ex. K, Whitt (30(b)(6)) Tr. 60:7:11.) CSX issues quarterly operational testing requirements for its managers. (Id. 60:12-19.)  The quarterly requirements specify the number of tests managers must perform each quarter, as well as the work activities and work rules that managers must test employees on.  (Id. 61:23-63:16; Ex. K, pp. 108-09.)  Banner tests nor tests for compliance with Operating Rule 300.4 or Air Brake and Train Handling Rule 5501.1 were among the test Trainmasters Smith and Hiers were required to perform in the first quarter of 2019.  (Ex. K, Whitt (30(b)(6)) Depo., at 61:14-63:16, 65:6-14.)

40.     Disputed that banner tests test for compliance with train handling rules. Trainmaster Smith's operational testing records show that Jeremy Hitt is the only employee he tested for compliance for train handling rules in connection with a yard banner test, which test for compliance with Operating Rule 300.4.  (*E.g., compare* Ex. T, Smith Test Records, p. 73 [entries #2020-2023 (Hitt test)] *with* Ex. T, p. 4 [entry #227]; p. 7 [entries #303-307], p. 20 [entries #687-689, #695-697]; p. 25 [entry #848], p. 27 [entries #905-906].)  Disputed as to the last sentence. Three weeks before  Hitt's banner test, CSX issued a system notice titled System Notice #100, which explicitly addressed what an employee must do to pass a banner test.  (Ex. K, pp. 31, 61; Ex. K, Whitt (30)(b)(6)) Tr. 41:19-42:2, 42:8-14, 48:21-49:2.)  A system notice is a posted notice of information issued by CSX's Director of Operating Practices to CSX's entire system—managers and non-managers alike.  (Ex. M, Smith II Tr. 10:23-12:14; Ex. K, Whitt

(30)(b)(6)) Tr. 36:22-37:6.)[2]  Two of CSX's stated purposes in issuing System Notice #100 was to notify employees about different devices used during operational tests and to notify employees about "the actions that employees must demonstrate to comply with the operational tests."  (Ex. K, p. 91 [Item 109]; Ex. K, Whitt (30)(b)(6)) Tr. 41:19-42:2.)  System Notice #100 states that a simulated obstruction device test, i.e., a banner test, is performed "when equipment is required by rule to operate at a speed that permits stopping within ½ the range of vision." (Ex. K, p. 91 [Item 110].)  Regarding what an employee must do to pass a banner test, System Notice #100 states, "*Stop equipment short of the device. Employees will be considered as being non-compliant with the rule(s) being tested when any contact occurs between equipment and the devices.*"  (Id. [emphasis added].)  CSX's Director of Operating Practices, Joseph Whitt, testified that system notices are written to be clear and explicit so employees have a clear understanding of what conduct does and does not comply with CSX rules and that employees may rely on the accuracy and completeness of the information contained in system notices in conforming their conduct to CSX rules.  (Ex. K, Whitt (30)(b)(6)) Tr. 12:10-16, 25:4-26:8, 27:3-10, 42:3-7.)

41.     The banner test occurred on the night of January 21, 2019.  (Ex. M, Smith II Tr. 30:11-17.)  Both footnotes to this paragraph are also disputed.  The text message referred to in Footnote 8 does not "arguably suggest" that Josh Hiers helped set up the banner test.  (Ex. M, p. 37.)  Josh Hiers was the only manager named Josh at Boyles Yard. (Ex. M, Smith II Tr. 46:15-19.)  As to Footnote 9, Plaintiff disputes Trainmaster Smith's self-serving explanation for setting up the banner test where he did.  Trainmaster Smith set up the banner test in the most curved portion of track at Boyles Yard at night, while cars were aligned on adjacent tracks.  (Ex. L,

---

[2]     Anytime a system notice is issued, managers and employees must read the system and understand the instructions contained therein before starting their next tour of duty.  (Ex. M, Smith II Tr. 12:9-19.)

Smith I Tr. 114:12-22.)  The text message to Tony Thomas—referenced in Paragraph 42 of

CSX's Statement of Undisputed Facts— indicates that he set up the test with the expectation and

intent that  Hitt would fail.  (Ex. M, p. 37.)

42.      Nick Smith sent the initial text message to Tony Thomas—not  Hitt. (Ex. M,

Smith II Tr. 37:18-38:8.)

43.      Disputed as incomplete.  See Plaintiff's Statement of Undisputed Material Facts.

44.      _Third sentence_:  Disputed to the extent this sentence implies that  Hitt's use of the

emergency brake while pulling a cut of 20 cars at 7 mph – less than half the maximum restricted

speed of 15 mph – without air caused rapid or severe slack change.  The slow speeds and limited

number of cars involved in yard switching movements do not generate slack forces great enough

where a derailment or equipment damage would be an issue with an emergency brake

application.  (Ex. D, Roper Dec. ¶  4.)  The video of banner test confirms this. (Ex. N,

Locomotive Video.)  _Fourth sentence_:  Disputed as misleading.  CSX's evidentiary citations

stand for the proposition that stopping gradually is the preferred method of stopping _for planned_

_stops_. (Ex. O, Ammons Tr. 27:6-12, 39:2-41:6.)  A banner test is not a planned stop; it simulates

an unforeseen obstruction. (Ex. L, Smith I Tr. 82:2-6.)  _Fifth sentence_:  Disputed.  Boyles Yard

RCOs have testified to the contrary. (Ex. P, Roper Tr. 47:3-48:4 [trained to use emergency brake

whenever you needed to stop as quickly as possible], 48:16-18 & 66:16-23 [not trained that to

only use emergency brake in emergency situations or when it was absolutely necessary]; Ex. Q,

Pledger Tr. 27:7-20 [trained that the emergency brake is "there if you need it," not as a last

resort], 32:4-17 [stating that it is appropriate to use emergency brake "if you come up on

something"].  _Sixth sentence (first clause)_:  Disputed that CSX does not view a banner test as an

emergency.  A banner test is a simulated obstruction. (Ex. L, Smith I Tr. 82:2-6.)  CSX Operating

9

Rule 1010.3 requires locomotive operators to use emergency radio transmissions whenever they

encounter "obstructions to the track." (Ex. K, p. 107.)   Hitt and numerous Boyles Yard RCO

have testified that a banner test simulates an emergency situation based on their training. (Ex. C,

Hitt Tr. 48:18-49:2; Ex. P, Roper Tr. 75:23-76:14; 96:4-7; Ex. B, Crawford Tr. 84:5-10, 84:21-

85:13, 124:16-125:8 [trained that a track obstruction is an emergency and that a banner test

simulates an obstruction]; Ex. Q, Pledger Tr. 69:21-71:12 [trained that a track obstruction is an

emergency and that a banner test simulates obstruction].)  Even CSX's corporate representative

testified that a banner test simulates an emergency situation. (Ex. R, Hiers (30(b)(6)) Tr. 27:6-8.)

*Sixth sentence (second clause)*:  Disputed that CSX's proffered comparators are "similarly

situated" for the reasons stated in response to Paragraph 58 of CSX's Statement of Undisputed

Facts, *infra*.

45.     The second sentence and footnote are disputed as misleading.  The language

quoted in Footnote 11 comes from CSX's trainee manual for remote control operators.  (CSX Ex.

G, doc. 31-10, pp. 29, 129.)  This complete passage states:

> It is the remote control operators' responsibility to know when the automatic
> brake (train brake) is necessary to control switching or train movements
> associated with remote control. *Local instructions and/or practices will address*
> *most day-to-day operations that require the use of the automatic brake.*

(Id.  p. 129 [emphasis added].)  The local instructions at Boyles Yard were not to perform

switching operations with air on the cars unless pulling a cut of 30 or more. (Ex. C, Hitt Tr. 51:1-

7; Ex. B, Crawford Tr. 49:16-50:2; 135:4-136:10; Ex. Q, Pledger Tr. 22:21-23:2.)

46.     Undisputed.

47.     Disputed to the extent the second sentence implies that Trainmaster Nick Smith

did not know  Hitt had two active non-major – also known as "serious" – offenses on his

disciplinary record before calling Tony Thomas.  Before serving as the hearing officer at  Hitt's January 17, 2019, Trainmaster Smith received two emails showing that the securement/bathroom emergency charge against  Hitt was a "Serious 2."  (Ex. J, pp. 48-51; Ex. F, Hiers Tr. 74:16-75:18; Ex. J, Eady (30)(b)(6)) Tr. 55:7-56:2.)  This meant the securement charge put  Hitt in Step 2 of CSX's three-step progressive discipline policy for non-major offenses. (Ex. J, Eady (30)(b)(6)) Tr. 59:2-17.)  Trainmaster Smith also read the charge letter into the record at the January 17, 2019, including the language offering Hitt a one-day suspension in exchange for signing a waiver and admitting the rule violation.  (Ex. G, Hearing Tr. 1:3-8, 2:14-3:26.)  CSX offers employees in Step 2 of the progressive discipline policy a one-day suspension in exchange for signing a waiver.  (Ex. J, p. 45; EX J, Eady (30(b)(6)) Tr., 33:2-10.)  CSX admits that the charge letter's waiver language read by Trainmaster Smith at the January 17, 2019, disciplinary hearing showed the securement charge put  Hitt in Step 2 of CSX's three-step discipline policy. (Ex. J, Eady (30)(b)(6)) Tr. 48:21-50:4.)  Trainmaster Hiers—who set up the January 21, 2019, banner test with Trainmaster Smith—admits that he knew  Hitt was in Step 2 before January 21, 2019.  (Ex. F, Hiers Tr. 75:19-76:2.)  The second sentence is also disputed to the extent it implies that Tony Thomas played a role in the decision to bring disciplinary charges against  Hitt.  "Nick Smith decided to charge Complainant with rule violations related to the banner test performed on January 21, 2019."  (Ex. I, CSX Ans. to Interrog., p. 2.)

48.    Disputed as incomplete.  Trainmaster Smith told  Hitt that the reason using the emergency brake is prohibited to stop for a banner test is because it could cause a disaster "if you're going down the main line with 100 cars, 50 miles per hour."  (Ex. A, Hearing Tr. 51:1-11.)  Trainmaster Smith said that the prohibition is implicit in Operating Rule 300.4.  (Ex. C, Hitt Tr. 102:12-20.)  He did not show  Hitt any other rules.  (Id. 110:18-23.)

11

49.     Undisputed.

50.     Disputed to the extent Trainmaster Smith looked at the video before bringing disciplinary charges against Hitt on January 23, 2019. The still shots that Trainmaster Smith took from the video are dated January 24, 2019. (Ex. A, pp. 61-63.) The January 23, 2019, charge letter does not charge Hitt for failing to stop within half his range of vision. (Ex. A, p. 54.) This paragraph is also disputed as suggesting an employee, who stops short of the banner, fails the test if he does not stop within half his range of vision. System Notice #100 sets out what employees must do to demonstrate compliance with a banner test, and all employees must do per System Notice #100 is, "Stop equipment short of the device." (Ex. K, p. 91.)

51.     Disputed that Trainmaster Smith recording Hitt's banner test as a failure "automatically generated an assessment." CSX's evidentiary citation does not support this statement, and Trainmaster Smith testified unequivocally that he entered the assessment form against Hitt, which triggered the disciplinary process by prompting Field Administration to draft the charge letter. (Ex. L, Smith I Tr. 87:23-89:6, 109:4-7 [Q. "And you're saying he failed to -- and these are your words, right, that you put in the assessment form; right? A. I typed that, correct."]; Ex. I, CSX Ans. to Interrog., p. 3.) The assessment was not "automatically generated."[3]

52.     Disputed as an incomplete recitation of the relevant facts from the hearing.

_____

[3]    CSX is attempting to distance Trainmaster Smith from the decision to bring disciplinary charges against Hitt in connection with the banner test. Federal law requires that railroad managers record the results of their operational testing. 49 C.F.R. § 217.9(d) CSX managers record their operational test results in its Operational Practices Tracking System or "OPTS." (Ex. L, Smith I Tr. 31:10-20.) As CSX notes in Paragraph 27 of its undisputed facts, a manager can initiate disciplinary proceedings against an employee by entering an "assessment." By claiming that the assessment against Hitt was "automatically generated" when Trainmaster Smith recorded the banner test into OPTS, CSX is suggesting that Trainmaster Nick Smith did not decide to initiate the disciplinary process. Rather, it was done "automatically." This is incorrect and flatly contradicted by Trainmaster Smith's deposition testimony.

53.     Disputed as incomplete.  After being reminded on February 28 that the discipline decision was due the next day, Michael Dilday sent the following email to members of Relations and Gary Adkins: "I cant find the recommendations on the below employee. After conversations with my team i beleive [sic] i have a good idea. But can i get the transcript and recommendation from the investigation please? I will make my recommendation today…" (Id. p. 69)  Field Administration sent Dilday the authenticated copy of the hearing transcript and Hearing Officer Findings at 9:49 a.m. on February 28.  (Id. p. 124.)  One minute later, at 9:50 a.m., Dilday responded, "Please issue dismissal." (Id. p. 124.)

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Undisputed.

58.     Disputed that the comparators referenced in this paragraph are "similarly situated."  Each comparator was either an engineer or a conductor on a train operated by an engineer with air on the cars of the train.  (Ex. J, Eady (30(b)(6)) Tr. 64:20-68:12) CSX has not shown that these comparators were in the same division as  Hitt.  Furthermore, during that same time frame, the only RCOs charged with failing a banner test have struck the banner with the locomotive.  (Id. 80:17-84:11).

59.     Undisputed.

60.     Disputed to the extent CSX suggests the arbitration panel's decision is relevant for reasons discussed in response to Paragraph 38 of CSX's Statement of Undisputed Facts, *supra*.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    The Work, Training, and Supervision of Remote Control Operators.**

1.    Jeremy Hitt worked for CSX as a federally certified Remote Control Operator (RCO) at Boyles Yard in Birmingham, Alabama. (Ex. E, Hitt Declaration ¶ 1.)

2.    Hitt received instructions about what movements to make from the Boyles Yard yardmaster over the radio. (Id. ¶ 2.)  A yardmaster in a rail yard is analogous to an air traffic controller at an airport. (Ex. F, Hiers Tr. 25:12-20.)  Yardmasters and RCOs communicate via radio constantly through the shift.  (Ex. E, Hitt Decl. ¶ 2.)

3.    As an RCO, Hitt used a remote control box to operate locomotives during switching moves. The type of remote control box that Hitt used is shown in Ex. A to his declaration. (Id. ¶ 3, p. 6.)  Hitt wore the control box clipped to the front of his safety vest, in the manner shown in Ex. B to his declaration. (Id. ¶ 3, p. 7.)

4.    The RCO controls the speed of the remote control locomotive with the  speed selector on the right side of the control box. (Id. ¶ 3.)  The available speed settings are 15 mph, 10 mph, 7 mph, 4 mph, Couple (which is 1 mph), Coast and Stop. (Id.)  The RCO can control the remote control locomotive brakes using the knob on the left side of the locomotive. (Id.)  The independent brake applications available to the RCO are low, medium, full and emergency. (Id.)

5.    CSX trained Hitt that the 7 mph speed setting on the remote control box was the safest speed when pulling cuts of cars in Boyles Yard. (Ex.C, Hitt Tr. 12:16-18.)

**B.    CSX Emergency and Banner Test Rules.**

6.    CSX Air Brake and Train Handling Rule 5904.5 is the rule applicable to RCOs on responding in emergency situations.  (Ex. E ¶ 5, pp. 8-12.)  That rule states that whenever an

emergency situation occurs, the RCO must "immediately stop the movement by making an emergency application of the air brakes." (Id.)

7.      CSX Operating Rule 1010.3 requires locomotive operators to report emergencies over the radio via an emergency radio transmission.  The emergency situations that employees must report using an emergency radio transmission include "obstructions to the track."  (Ex. K, Whitt (30(b)(6)) Tr. 57:20-59:12; Ex. K, p. 107.)

8.      A banner test simulates an obstruction to the track.  (Ex. L, Smith I Tr. 82:2-6.)

9.      On December 28, 2018, CSX issued System Notice 100 to its employees and manager.  (Ex. K, Whitt (30(b)(6)) Tr. 39:9-11.)   A system notice contains information and instructions issued by CSX Director of Operating Practices, the manager who "[w]rites the rules for the railroad."  (Id. 12:13-16, 37:1-3)  One of the stated purposes of System Notice #100 was to notify employees of the actions that they must demonstrate to pass with a simulated obstruction device test or "banner test." (Id. 40:4-42:7.)   To that end, the System Notice states: "Requirements of Employees - Stop equipment short of the device. Employees will be considered as being non-compliant with the rule(s) being tested when any contact occurs between equipment and the device." (Id. p. 91.)

### C.      The Role and Training of Trainmasters.

10.      Boyles Yard trainmasters are the direct supervisors of Boyles Yard RCOs. (Ex. E ¶ 6.)  Trainmasters have typically "[q]uite a bit" of interaction with the crews on duty. (Ex. X, Boyles Tr. 10:16-11:8.)

11.      Josh Hiers became a Boyles Yard trainmaster in May of 2018. (Ex. Hiers Tr. 9:12-15.)

15

12.     When he started, his immediate supervisor was Assistant Superintendent Martin White.  Brandon Hinton became the Assistant Superintendent at Boyles Yard around August 2018.  (Id. 14:5-15:8)

13.     Trainmaster Hiers "constantly" supervised the employees working in the yard. (Id. 19:1-10.)  Typically, there were only three to four crews working in the yard at any given time.

14.     He spent the majority of his day with the yardmaster, which allowed him to hear yardmaster's communications with crews and provide assistance to the yardmaster in real-time. (Ex. F, Hiers Tr. 24:14-25:11.)  He also monitored the work of the RCOs through camera system in his office where he could access the 40 cameras at Boyles Yard and watch the employees work. (Id. 21:13-24:14.)  Trainmasters also could monitor and communicate with yard crews through handheld radios and radios in their company vehicle.  (Id. 21:6-18.)   He also had a radio in his truck. (Id. 21:13-15.)

15.     Nick Smith was a CSX trainmaster but not at Boyles Yard.  Smith was a trainmaster on the Birmingham Mineral Subdivision. (Ex. L, Smith I Tr. 21:18-22:6.)  His office was in Bessemer. (Id. 33:12-21.)

16.     Nick Smith had no supervisory responsibilities for Boyles Yard employees, like Jeremy Hitt, except on rare occasions when the Assistant Superintendent at Boyles Yard would take vacation.  (Id. 44:4-45:5, 55:7-15.)

17.     Nick Smith thinks the lightning incident with Jeremy Hitt occurred when he was covering for Martin White.  (Id. At 44:4-45:5.)  Smith testified that he may have covered for Brandon Hinton the summer that he arrived in 2018, but "I don't think I've covered again until a year later maybe."  (Id. At 15:2-4.)

16

18.     Other than covering for his bosses, Smith's interaction with Jeremy Hitt and Boyles Yard RCOs was limited to "[e]very once in a while" giving job briefings at Boyles Yard about rule changes or incidents and "things like that." (Id. 37:6-14.)

19.     At his deposition in September of 2021, the lightning incident was the only encounter that Nick Smith specifically recalled ever having with Jeremy Hitt before the banner test on January 21, 2019.  (Id. 38:10-42:19.)  Smith remembers Hitt raising safety concerns about working in lightning that day.  (Id. 42:16-19.)

20.     CSX provided Trainmasters Nick Smith and Josh Hiers with training on the protections afforded to employees under the Federal Railroad Safety Act. (Ex. Y, Miller (30(b)(6)) Tr. 12:22-13:8, 16:10-14, 17:1-20, 18:17-19).  CSX trained them that an employee's reporting of a hazardous safety condition and refusal to work under certain hazardous conditions are protected activities under the FRSA and that managers are prohibited from retaliating against employees for engaging in protected activities. (Id. 17:1-18:1.)

21.     One of the "Key Points to Remember" was that using operational testing to purposely target an employee for discipline for engaging in FRSA-protected activities was prohibited.  (Id. pp. 21:1-22:20.)

22.     CSX managers have discretion for whether to bring disciplinary charges against an employee for an operational test failure. (Ex. F, Hiers Tr. 31:21-32:2.)

**D.     The Securement Charge Puts Hitt in Step Two of IDPAP Progressive Discipline Process**.

23.     In the fall of 2018, Hitt was working a one-man RCO puller job on "[p]retty heavy night" when Trainmaster Hiers approached him and said that "we need to move fast and move more efficient to try to catch up."  (Ex.C, Hitt Tr. 38:6-20.)  After Hitt told him that 7 mph is the

17

safest speed for carrying a cut of cars and that is the speed he would go, Hiers responded: "Well, we need to pick it up.  Need to get faster.  Need to get a little more efficient."  (Id. 40:10-21). The next faster speed available on the remote control box after 7 mph is 10 mph, which was the maximum allowable speed for yard tracks in Boyles Yard at that time. (Id. 41:2-21.)  Hitt understood Hiers to be telling him to go 10 mph. (Id.).  This encounter was "probably a month or so before" Hiers charged Hitt for the securement violation.  (Id. 67:23-68:6.)

24.     On November 25, 2018, Hitt was working with John Corneglio at the time of his bathroom emergency. (Id. 67:11-14.)  The feeling that he was about to defecate on himself struck Hitt just after he and Corneglio finished applying and testing the handbrakes on a cut of cars. (Id. 64:18-66:5).  Before rushing to the bathroom, Hitt "tied the engine down with the handbrake feature on my remote box" and "turned the box off." (Id.) As Corneglio drove him to the bathroom, Hitt radioed the yardmaster and told him that he "had a bathroom emergency, the engine is tied down and I will be right back."  (Id. 71:2-13.) In response, the yardmaster radioed "That's okay" and for Hitt to take his time. (Id.) Hitt and Corneglio were gone from their locomotive for seven to eight minutes, and when they drove back up to the locomotive, Trainmaster Hiers was waiting.  (Id. 72:18-73:8.)

25.     Trainmaster Hiers spent most of each day with the yardmaster so that he can hear all the radio transmissions between the yardmaster and the crews. (Ex. F, Hiers Tr. 24:14-25:11.) The yardmaster's office is located in the south tower of Boyles Yard. (Ex. G, Hearing Tr. 4:24-26)  Trainmaster Hiers says that he "came upon the locomotive just driving through the yard" as he was driving from the south tower. (Id. 10:36-37; Ex. F, 37:1-3.)  It would not be unusual to see a locomotive coupled to cars in Boyles Yard on the west lead. (Ex. F, 33:17-34:5.)

18

26.     Trainmaster Hiers charged Hitt with failing to secure equipment left unattended. (Id. 56:23-57:4.)  Hiers did not charge Corneglio, who he knew to be RCO certified.  (Id. 55:9-57:4.) Hiers is familiar with CSX Operating Rule 112.1 which states that "Each crew member is equally responsible for the following: (1) complying with all rules."  (Id.)  Hiers agrees that under this rule Corneglio shared responsibility for the securement violation.  (Id.)

27.      Trainmaster Smith has held many disciplinary hearings and he does not recall ever finding that the charges were not proven or recommending exoneration. (Ex. L,Smith I Tr. 49:23-50:8.)

**E.     The "Tough" Banner Test**.

28.     On January 21, 2019, four days after serving as the hearing officer at Jeremy Hitt's step 2 disciplinary hearing, Nick Smith was working his regular job as trainmaster on the Birmingham Mineral Subdivision.  (Id. 75:4-6, 76:16-17)

29.     That day, Smith was part of an operational test team with Assistant Superintendent Brandon Hinton and Trainmaster Donovan Boyles. (Ex. U, Boyles (30(b)(6)) Tr. 15:20-16:2.) A "test team" is when a group of supervisors perform operational tests together. (Id. 31:11-32:15.)

30.     Donovan Boyles was a relatively new trainmaster at Boyles Yard, and Smith and Hinton were helping him learn how to conduct and record operational tests. (Id. 11:12-15, 13:15-14:21.)  The team began their testing on the Birmingham Mineral territory and the plan was to come back to Boyles yard for more testing. (Id. 18:15-20:17,34:19-35:1.)

31.     Trainmaster Smith, Donovan Boyles and Brandon Hinton Smith performed operational tests as a team on the Birmingham Mineral between 11:45 am and 2:30 pm.. (Id. 13:10-16:2, 18:10-20:22, 22:5-23:13, 33:16-34:3, and PX2 at p. 20.)  They tested employees for

compliance with rules for the operation of hand throw switches, shoving equipment, electronic devices and paperwork, all of which were among the activities and work rules that trainmastes were required to test in the 1st Quarter of 2019. (Id. 18:10-20:22, and PX2 at p. 20; Ex. K, Whitt (30 (b)(6)) Tr. 61:8-65:14, and PX6 at pp. 108-112.)

32.     The test team then drove to Boyles Yard for more testing, but Smith drove separately from the team.  (Id. 34:4-16.)  He never rejoined the test team at Boyles Yard.

33.     Josh Hiers was the trainmaster on duty.  (Ex. R, Hiers (30(b)(6)) 14:19-15:22).

34.     Hiers knew that Jeremy Hitt was working the second shift Y293 job on January 21, 2019. (Id. 16:13-21.)

35.     Jeremy Hitt began his tour of duty as the RCO for the Y293 job on January 21, 2019, around 3:00 pm.  (Ex. C, Hitt Tr. 88:9-15.)  The Y293 job was a one-man RCO job that pulls cars from the receiving yard to the departure yard. (Id.)  Hitt had been working this job once or twice a week for two months. (Ex. C, Hitt Tr. 88:18-21.)

36.     Smith arrived as early as 4:01 p.m.  (Ex. M, Smith II Tr. 86:16-87:1.)

37.     The only operational test that Trainmaster Smith performed at Boyles Yard was the banner test that he performed on Hitt at 7:20 p.m.  (Ex. U, Boyles (30(b)(6)) Tr. 38:13-40:2.)

38.     In the four years preceding January 21, 2019, Smith had never banner tested a RCO at Boyles Yard. (Id. 65:15-66:2.)  There are no RCOs on the Birmingham Mineral. (Ex. L, Smith I Tr. 45:14-16, 133:24-134:12.)

39.     Trainmasters Smith and Hiers set up the banner test. (Ex. M, Smith II Tr. 37:12-38:13, 46:15-19; Ex. M, 37.)  The banner was placed in the curve in the 6 west track that is the most severe curve in Boyles Yard.  (Ex. L, Smith I Tr. 114:19-22.)  It was dark and there was no much lighting in the area where the banner was placed. (Ex. A, Hearing Tr. 7:31-8:8.)

40.     After setting up the banner, Trainmaster Smith sent this text message at 18:52:



(Ex. M, Smith II Tr. PX4 at p. 37.)

41.     From 6:45 p.m. to 7:15 p.m., Hitt was picking up cars in the south yard in preparation for pulling a cut into the west yard when Trainmaster Smith sent the above text. (Ex. U, Boyles (30(b)(6)) 35:16-19, and PX2 at p. 20; Ex. E ¶ 7.)  During the half hour before the banner test, Hitt and Yardmaster Robert Gandy spoke back and forth multiple times over the radio about the details of the switching movements being made and to be made. (Ex. E. ¶ 7.)

42.     While waiting at the banner, Trainmaster Smith listened on the radio to the 293 job that Jeremy Hitt was working make a move in the south yard and get ready to pull into the west yard. (Ex. A, 7:15-18.)

43.     For the pull from the receiving yard tracks to the departure yard, Yardmaster Gandy routed Hitt into the 6 west track. (Ex. E ¶ 7.) Yardmaster Gandy lined the switches for the movement, an indication that the tracks ahead were clear.  (Id.)

44.     The movement called for Hitt to pulling 20 cars or so to the departure yard, and in accordance with routine practice, Hitt made the movement without air. (Ex. C, Hitt Tr.140:20-141:10.)

21

45.     Even though CSX had increased the maximum speed for movements on yard tracks in Boyles Yard to 15 mph on January 1, 2019, Hitt used the 7 mph speed setting for this movement.  [Ex. A, 38:2-39:8; Ex. C, 91:13-15; Ex. D ¶ 5.]  When Hitt rounded the curve at the south end of the 6 west track, he saw the banner about three car lengths away.  (Ex. C, 93:8-94:1.)  He responded immediately by turning the brake knob on the control box to emergency and stopped well short of the banner.  (Ex. E, ¶ 8.)

46.     Hitt used the emergency brake to stop for the banner,  just as would have used it to stop for the "[e]nd of [a] train, car, children playing, broken rail." (Ex. A, Hearing TR. 34:19-42.)  There was no derailment, no damage to equipment, or no severe slack. (Ex. C, Hitt 154:10-15.)  There is no risk of such things when using the emergency to stop a 20 car cut without air from 7 mph. (Ex. B, Crawford Tr. 136:12-16; Ex. D, Roper Dec. ¶ 4.)

47.     During the brief conversation that followed the test, Trainmaster Smith complimented Hitt for stopping and then removed the banner so that Hitt could continue with the assigned movement. (Ex. E ¶ 8.)  It was not until after Hitt completed that movement 15 minutes later that Trainmaster Smith summoned him to the office pocket track to tell him that he was being charged and removed from service for Step 3 discipline handling.  [Id.]

48.     During their meeting at the office pocket track, Trainmaster Smith told Hitt that although he had stopped within half the range of vision, his use of the emergency brake violated Rule 300.4. (Ex. A, Hearing Tr. 28:28-29:16, 51:1-22.)  In response to Hitt showing him that the Rule 300.4 does not say that use of the emergency brake is not allowed, Smith said that "It's implied that you can't use - - you can't us emergency." (Ex. C, Hitt Tr.102:12-22.)  Smith went on the say that "the reason why we can't put it in emergency is because, you know, if you're

going down the main line with 100 cars, 50 miles an hour, that obviously the potential disaster that could cause." (Ex. A, Hearing Tr. 51:1-22.)

49.     At 21:23, two hours after the banner test and after removing Hitt from service, Trainmaster Smith sent the following text message to Angelo Cassaro, who is someone who Smith had worked with ten years earlier:



(Ex. M, Smith II Tr. 53:5-56:22 and PX 4 at p. 38.)

50.     CSX convened a formal disciplinary hearing on the banner test charges on January 30, 2019. (Ex. A, p. 1.)  Trainmaster Smith was the Charging Officer and only company witness. (Id. 4:15-16.)

51.     During the hearing, Trainmaster Smith testified that a banner test simulates an obstruction, which "could be a car, could be men and equipment, it could be anything that would hinder the movement of the locomotive across that portion of the track.  Or cause any kind of safety hazards." (Id. 23:13-19.)  Contrary to his earlier text and the language of the charge letter, Trainmaster Smith testified at the disciplinary hearing that Hitt failed the banner test to stop within half his range of vision.  (Id. 14:4-6.)

52.     Trainmaster Smith testified that Hitt violated CSX Operating Rule 300.4 and Air Brake and Train Handling Rule 5501.1, he admitted that neither rule actually says that emergency brake use is forbidden, and his testimony was the only evidence presented at the hearing that

using the emergency brake is in response to a banner violates Rule 300.4 and Air Brake and

Train Handling Rule 5501.1.  (Id. 36:1-37:13, 46:1-34).

      53.     Hitt testified that he complied with both rules. (Id. pp. 47:7-16, 49:12-19.)

Having been a long time RCO, he knew that there was no potential danger in using the

emergency brake to stop his movement.  (Id. p. 51:6-9.)  "I knew with as many cars as I had and

me using the emergency application function that there would be no derailment whatsoever, no

broken knuckles or anything of that nature." (Id.)

      54.     After the hearing, Senior Trainmaster Adkins submitted Hearing Officer Findings

in which he stated that it had been proven that Hitt violated rules 300.4 and 5501.1, as well as

two other rules that were never mentioned or presented at the hearing. (Ex. V)

      55.     Superintendent Michael Dilday signed the letter suspending Hitt for the

securement violation and the letter terminating him for the banner test.  (Ex. H ¶ 10).

      56.     Dilday has issued the disciplinary decisions after approximately 40 investigations

in which Ronnie Head represented the charged employee, and Head does not recall Dilday ever

not finding the employee guilty.  (Id.)

      57.     None of the comparators that CSX has identified as RCOs who it has charged for

banner test violations stopped without hitting the banner.  (Ex. J, Eady (30(b)(6)) Tr. 80:17-

84:11, 96:11-97:6.)

## **FRSA LEGAL STANDARD**

      Congress has long recognized that railroads put productivity ahead of safety, including by

retaliating against employee who report or refuse to work in unsafe conditions.  Over the years,

Congress has tried numerous regulatory fixes, each of which has failed to deter railroads from

harassing, intimidating and retaliating against employees who affect productivity by taking the

safe course of action.  After years of hearings and deliberation, Congress amended the Federal

Rail Safety Act of 2007 by *The Implementing Recommendations of the 9/11 Commission Act of*

*2007*, Pub. L. 110-53, 121 Stat. 44, and the *Rail Safety Improvement Act of 2008*, Pub. L. 110-

432, 122 Stat. 4848.

The FRSA amendments symbolize Congress's decision to end reliance on the rail

industry self-policing and the FRA's lax enforcement of anti-retaliation regulations.   The

amendments also represent Congress's recognition of the railroad industry's retaliatory culture,

as demonstrated by the amendments heavily tilting the scales of justice in favor of employees.

Specifically, Congress relaxed the standards of proof and causation under the FRSA by

incorporating the burden-shifting framework governing the employee protection provision of the

Wendell H. Ford Investment and Reform Act for the 21st Century ("AIR-21"). See 49 U.S.C. §

20109(b)(1)-(2), (d)(2)(A)(I) (incorporating 49 U.S.C. § 42121(b).  Under the AIR-21 burden-

shifting framework, and thus the FRSA, an employee establishes his or her case by

demonstrating that his or her protected activity "was a contributing factor in the unfavorable

personnel action."  49 U.S.C. § 42121(b)(2)(B)(iii).  Courts have held that a FRSA plaintiff

establishes a prima facie case under this standard by showing that: "(1) [he] engaged in protected

activity; (2) the employer knew that [he] engaged in protected activity; (3) [he] suffered an

unfavorable personnel action; and (4) the protected activity was a contributing factor in the

unfavorable action." *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir.

2013) (quoting *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008)).  If the

plaintiff establishes a prima facie case, the railroad is liable for retaliation unless it proves "by

clear and convincing evidence, that [it] would have taken the same unfavorable personnel action

in the absence of [the plaintiff's protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(ii).

The AIR-21 burden-shifting framework is much more friendly to plaintiff-employees than the *McDonnell Douglas* burden-shifting framework that is employed by Title VII and the other "traditional" employment-discrimination statutes to which CSX attempts to liken the FRSA.  *See* 49 U.S.C. § 42121(b); *Araujo*, 708 F.3d 152, 158 (3d Cir. 2013) ("FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework.").  For employers, this is a "tough standard, and not by accident." *Id.* (quoting *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)).  The standard is tough "due to a history of whistleblower harassment and retaliation in the [railroad] industry."  *Id.* (citing *Stone & Webster*, 115 F.3d at 1562).  Congress intended for railroad companies to face difficulties defending themselves in FRSA cases and to finally and "comprehensively address and prohibit harassment, **in all its guises**" against employees who engage in protected activity.  *Hutton v. Union Pacific Railroad Co.*, ARB No. 11-091, ALJ No. 2010-FRS-20 (ARB May 31, 2013) (internal quotations and citations omitted; emphasis added).

## ARGUMENT

### A.    Plaintiff Can Establish a Prima Facie Case of Retaliation under the FRSA.

CSX contends that it is entitled to summary judgment because  Hitt cannot establish a prima facie case of FRSA retaliation.  CSX does not dispute that  Hitt engaged in protected activity by refusing Trainmaster Smith's demands to return to work during a lightning storm and by refusing Trainmaster Smith's demand to "work faster" than 7 MPH, for safety reasons when switching.  *See* 49 U.S.C. § 20109(b)(1)(B) (protected activity under the FRSA includes "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties.")   Nor does CSX contest that  Hitt suffered adverse employment actions when it charged him, pulled him out of service, and terminated him in

26

connection with the January 21, 2019, banner test.  Rather, the railroad asserts that  Hitt cannot satisfy the contributing factor element.  Specifically, CSX claims that Hitt cannot show that the lightning incident or his refusal to operate at unsafe speeds were a contributing factor to the adverse actions taken against him.  CSX is incorrect.

### 1.      Contributing Factor Standard.

The FRSA's "contributing factor" standard is "broad and forgiving" and "was intended to overrule existing case law, which require[d] a whistleblower to prove that his protected conduct was a significant, motivating, substantial, or predominant factor in a personnel action in order to overturn that action."  *BNSF Ry. Co. v. United States DOL*, 816 F.3d 628, 639 (10th Cir. 2016) (citation and quotation marks omitted); *Shearrer v. Norfolk S. Ry. Co.*, No. 2:19-cv-01062-JHE, 2021 U.S. Dist. LEXIS 43389, at *23-24 n.5 (N.D. Ala. Mar. 9, 2021) (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).  A "contributing factor" under the FRSA is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158 (quoting *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 563, 567 (5th Cir. 2011)); *see also James v. CSX Transp. Inc.*, No. 4:15-CV-204 (CDL), 2017 U.S. Dist. LEXIS 143640, at *15 (M.D. Ga. Feb. 21, 2017).  The United States Supreme Court has interpreted similar language as creating liability when an employee's conduct had "even the slightest" influence on her employer's decision.  *Yowell v. Admin. Review Bd.*, U.S. Dep't of Labor, 993 F.3d 418, 424 (5th Cir. 2021) (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 695-99, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011)).

In *Araujo*, the Third Circuit explained that under the contributing factor the employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his [protected] disclosure was a

27

contributing factor to the personnel action." 708 F.3d at 158 (emphasis in original) (quoting *Marano*, 2 F.3d at 1141); *see also Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019); *Norfolk S. Ry. v. United States DOL*, No. 21-3369, 2022 U.S. App. LEXIS 33326, at *28 (6th Cir. Dec. 2, 2022); *Shearrer v. Norfolk S. Ry. Co.*, No. 2:19-cv-01062-JHE, 2021 U.S. Dist. LEXIS 43389, at *23-24 n.5 (N.D. Ala. Mar. 9, 2021).

Citing a quip from the Eighth Circuit that the FRSA's contributing factor requires that the plaintiff to prove "intentional retaliation," CSX goes on to cite cases arising under "traditional" employment discrimination statutes to paint the "contributing factor" standard as tantamount to the plaintiff's burden under *McDonnell Douglas*. It is well-settled, however, that demonstrating pretext is not required to establish contributing factor causation. As stated by the Administrative Review Board:

> Importantly, if the [fact-finder] believes that the protected activity *and* the employer's nonretaliatory reasons both played a role, the analysis is over and the employee prevails on the contributing-factor question. . . . Since the employee need only show that the retaliation played some role, the employee necessarily prevails at step one if there was more than one reason and one of the reasons was the protected activity.

> This is why we have often said that the employee does not need to disprove the employer's stated reasons or show that those reasons were pretext.

*See Palmer v. Canadian Nat'l Ry.*, No. 16-035, 2016 DOL Ad. Rev. Bd. LEXIS 60, 2016 WL 5868560, at *9 (Dep't of Lab. Admin. Rev. Bd. Sept. 30, 2016) (en banc).

For that same reason, the "honest belief" doctrine is not a defense to causation in FRSA retaliation cases unlike other traditional employment discrimination statutes. Both circuits that addressed this issue directly - one of which is the Eighth Circuit - agree on this point and have rejected the position that CSX advances here. *See Blackorby v. BNSF Ry. Co.*, 936 F.3d 733, 737 (8th Cir. 2019) (reversing defense verdict because the trial court erred in instructing the jury that

28

"BNSF Railway cannot be held liable under the FRSA if you conclude that BNSF Railway disciplined Plaintiff based on its honestly held belief that Plaintiff engaged in misconduct or committed a rules violation"); *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1197 (9th Cir. 2019) (finding a similar jury instruction to be reversible error in a FRSA retaliation case because it may have "encouraged the jury to skirt the actual issue and improperly focus on whether discipline was justified . . . instead of whether his protected conduct 'tend[ed] to affect in any way' the decision to terminate him."). The very essence of the contributing factor standard recognizes that discriminatory and nondiscriminatory reasons for an adverse action can co-exist. *Id.*; *Frost,* 914 F.3d at 1197. Thus, liability exists under the FRSA notwithstanding an employer's honestly held belief if retaliation was a contributing factor to the adverse action and the employer fails to prove by clear and convincing evidence that it would have taken the same action in the absence of the protected activity. *Blackorby*, 936 F.3d at 737.

### 2.   Contributing Factor Analysis

A plaintiff can establish contributing factor causation through circumstantial evidence. *Weeks v. Norfolk S. Ry.*, No. 5:16-CV-102 (MTT), 2017 U.S. Dist. LEXIS 149828, at *6 (M.D. Ga. Sep. 15, 2017) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). The types of circumstantial evidence that courts often consider in examining whether an employee can satisfy the contributing factor standard include, but are not limited to:

> [1] temporal proximity, [2] indications of pretext, [3] inconsistent application of an employer's policies, [4] an employer's shifting explanations for its actions, [5] antagonism or hostility toward a complainant's protected activity, [6] the falsity of an employer's explanation for the adverse action taken, and [7] a change in the employer's attitude toward [the complainant] after he or she engages in protected activity.

*Sirois v. Long Island R.R.*, 797 F. App'x 56, 59-60 (2d Cir. 2020) (citations omitted); *Bostek v.*

*Norfolk S. Ry. Co.*, No. 3:16-cv-2416, 2019 U.S. Dist. LEXIS 110623, at *12 (N.D. Ohio July 2,

2019); *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 885 (S.D. Iowa 2013).

    **3.**     **Temporal Proximity.**

    CSX argues that the time lapse between the lightning incident and the banner test charge,

for which Hitt was terminated, undermines any inference of causation.  But temporal proximity

should not be viewed in isolation - context and circumstances matter.  CSX ignores critical facts

that are relevant to the temporal proximity analysis.  Trainmaster Smith was not a supervisor at

Boyles Yard.  He was a trainmaster on the Birmingham Mineral subdivision and his office was in

Bessemer.  The lightning incident occurred in the summer of 2018 on one of the rare occasions

where Trainmaster Smith worked as a relief supervisor at Boyles Yard, which were the only

times that  Hitt worked under his supervision.  By his own admission, Smith is not certain that he

worked as a relief supervisor at Boyles Yard even once between the lightning incident and the

banner test.  At the time of his deposition, the one specific interaction that Smith remembered

having with  Hitt before the banner test on January 21, 2019, was the lightning incident.  It

appears from the evidence that the only time that Smith spoke with Hitt between the lightning

storm and the banner test was at the disciplinary hearing for the Step 2 securement charge.  That

hearing was held on January 17, 2019–just four days before Smith banner tested Hitt and charged

him for a Step 3 infraction.

    Viewing the evidence in context, Smith and Hiers targeted Hitt with a "tough" operating

test that they expected Hitt to fail just four days after the hearing on the Step 2 securement charge

which they knew would expose Hitt to severe discipline that could include termination.

### 4.      Hostility Toward Protected Activity.

When Hitt refused to operate faster than the safe speed for pulling cuts of railcars, Trainmasters Hiers and Smith told him to go faster.  When Hitt refused to work outside during a lightning storm over the phone, Trainmaster Smith drove down to confront Hitt face to face and threatened to relieve him of duty if he did not get back to work.  These responses reflect hostility toward Hitt's protected activities.

### 5.      Indications of Pretext.

CSX trained Trainmasters Smith and Hiers that purposely targeting an employee for discipline or excessive operational testing due to his FRSA protected activity violates the Act.  A fair conclusion from the evidence before the Court is that these managers ignored that training and purposely targeted Hitt for failure.  The evidence that Trainmaster Smith set up the January 21, 2019, banner test with the expectation and intent that  Hitt would fail and give him a basis for bringing Step 3 disciplinary charges against him is compelling.

Trainmaster Smith set up the banner test at night in the most curved portion of track at Boyles Yard.  Because there were cars in the adjacent tracks, there was no location at Boyles Yard where a locomotive operator would have less time and distance to stop the movement. Smith's text message to Tony Thomas shortly before  Hitt reached the banner all but confirms that he set up the banner test anticipating an operational test failure: "If someone hits a banner do you pull them out of service.  In a yard track?  <u>Josh and I have one set up and it's a tough test for the employee we are testing</u>."

A reasonable jury could reject Trainmaster Smith's claim that he was unaware  Hitt was the employee being tested.  The text message shows that  Hitt's direct supervisor that night–Trainmaster Josh Hiers–helped him set up the banner test.  Trainmaster Hiers testified he

31

"constantly" monitored the yard crews under his supervision by listening to their radio

communications with the yardmaster and watching the yard movements on cameras in his office.

Typically, there were only 3-4 yard crews working at Boyles Yard at any given time. (Boyles

30(b)(6) at 31:5-10.)   Second, the text message, standing alone, is suggestive that Trainmaster

Smith and Hiers both knew the identity of "*the employee* we are testing."  Third, Trainmaster

Smith arrived at Boyles Yard as early as 4:01 p.m.– more than two hours before the banner test

and not long after  Hitt started his shift.[4]  And Smith abandoned the test team to banner test Hitt

and did not rejoin the test team in order to banner test Jeremy Hitt.

Add to these facts that the test that was performed was both irregular and unprecedented.

Banner testing was not a test for managers to perform in the First Quarter of 2019.  Neither were

the rules used to charge Hitt.  Smith had never banner tested a RCO and had no direct

supervisory responsibility for RCOs.  The banner test of Hitt was the only operating test that

Smith performed that night even though he went to Boyles Yard for the sole purpose of

performing operating tests and had been there for hours.  Smith charged Hitt with violating Air

Brake and Train Handling rules that he had never tested for before.

The evidence of pretext includes Trainmaster Smith's shifting explanations which include

his contradictory accounts about whether Hitt stopped within half the range of vision.  On the

night of the test, Smith texted that Hitt did stop within half the range of vision, but he testified

that Hitt did not at the disciplinary hearing.  CSX seeks to explain away this stark contradiction

by saying that Smith changed his mind based on a later review of the video.  A reasonable jury

---

[4]

 A reasonable jury could also reject Smith's testimony that he asked Thomas about the disciplinary consequences of
hitting a banner because, at one time, it was categorized as a "major" rule violation.  This is unsupported by the
evidence.  Unlike the version effective in January 2019, CSX's 2015 IDPAP listed specific examples of rule
violations that constituted "serious" offenses – one of which was "Failure to stop short of Simulated Obstruction
Test (Banner)."  (Ex. S, at pp. 4-5.)  There is no evidence CSX has ever classified hitting a banner as a "major"
offense.

could reject this explanation as pure spin.  Indeed, a reasonable inference to be drawn from Smith's later video review is that he was still seeking a post hoc justification for the charges that he had brought after seeing that no rule prohibits use of the emergency brake.

The undisputed evidence is that pulling cuts into the departure tracks at seven (7) mph is customary and routine and less than half the maximum speed for yard tracks.  The video, which CSX did not provide to Hitt and did not present at the hearing, shows that this was a slow movement and a safe stop.  The video negates CSX claims that emergency braking presented any danger.

The disciplinary charges brought against Hitt after the banner test are also unprecedented. The comoparator evidence produced in this case shows that Hitt is the only RCO that CSX has ever charged for failing a banner test who did not run into the banner.

CSX's asserts that the facts of this case bear similarities to those in *Kuduk v. BNSF Ry. Co.*, 768 F3d 786 (8th Cir. 2014).  But unlike here, in *Kuduk* the Plaintiff could "point to no evidence of pretext, shifting explanations, antagonism or hostility" toward his protected activities.  768 F.3d at 790.  In *Kuduk*, there was no text message suggesting that the charging officer was targeting the employee for discipline.

**6.     Employer Knowledge**.

The decision process that resulted in Hitt's termination began with Trainmaster Smith's decision to charge Hitt with a banner test failure.  CSX managers have discretion for whether to bring charges against an employee for an operational test failure.  Trainmaster Smith decided to exercise that discretion by charging Hitt.  That Smith did so is not surprising given the evidence suggesting that he purposely set Hitt up for failure so that he could bring disciplinary charges.

In response to the evidence that Smith targeted Hitt for an operational test failure to

justify bringing Step Three disciplinary charges, CSX presents two arguments.  First, CSX claims

that Smith did not know that the RCO who he was setting up for failure was Hitt.  As discussed

above, the record contains ample proof from which a jury could reasonably conclude that Smith

did know that Hitt was the RCO for who he set up the "tough" test.  Second, CSX argues that

Smith's involvement in Hitt's termination was of no legal consequence for purposes of the

FRSA.  To this end, CSX argues that the only relevant decisionmakers are those who ultimately

assess the punishment.  Under CSX's analysis, it can never be held liable for unlawful retaliation

by Smith so long as its out-of-state final decisionmakers are unaware of the protected activities

that contributed to Smith's decision to bring the charge in the first place.  In other words, it

cannot be responsible for a charging officer's intentional retaliation as long as the managers who

have a final say remain ignorant of the protected activities of the employee being punished.  CSX

attempts to distance Trainmaster Smith from the discipline decisions and to focus solely on those

who made the final termination decision and were unaware of Hitt's protected activity.  CSX, as

it does in most cases, uses the insulation between the plaintiff and the final decisionmakers to

argue that it is entitled to summary judgment, *i.e.*, even though CSX's FRSA anti-retaliation

policies prohibit direct-line supervisors from performing operational tests purposely designed to

discipline employees who engage in FRSA-protected activity, it is entitled to summary judgment

even if Trainmaster Smith did just that because the final decisionmakers did not know about

Hitt's protected activities.  But Smith is a relevant decisionmaker - he decided to bring the

charge.  A charging officer's knowledge of an employee's protected activity is sufficient to

satisfy the employer knowledge element.  In *Head v. Norfolk Southern Ry.*, 2017 U.S. Dist.

LEXIS 147896 (N.D. Ala., Sept. 13, 2017), Division Manager Ryan McLain charged the plaintiff

with conduct unbecoming for offensive and inappropriate remarks and making a threatening

statement.  Following a disciplinary hearing, Labor Relations approved the hearing officer's

recommendation that the plaintiff be terminated.  The plaintiff sued under FRSA alleging that the

railroad took him out of service and terminated him for making safety complaints.  In its order

granting in part and denying in part the railroad's motion for summary judgment, the Court found

that the decisionmaker knowledge requirement was satisfied as to the safety complaints which

McLain, the charging officer had knowledge and not satisfied as to those he did not know about.

From the evidence, the jury could conclude that the punishment decisions of the out-of-

state decisionmakers are no more than a rubber stamp endorsement of the decision to charge.

There is evidence that Michael Dilday routinely, if not always, finds the employee guilty of the

charges brought against him and that he ordered that Hitt be dismissed just one minute after

receiving the authenticated hearing transcript.

Even if he did read the transcript, CSX's brief perfectly captures the reason why the final

decisionmakers review of hearing record does not constitute an independent investigation.  CSX

blames Hitt and his union representative for not showing CSX its own rules by not introducing

System Notice #100 into evidence at the disciplinary hearing.  Although System Notice #100

expressly states that stopping short of the banner, as Hitt did, is the banner test requirement for an

employee, CSX maintains that it did not and could not be expected to consider Hitt's compliance

with that rule because neither Hitt nor his union representative (a co-worker with no legal

training) discussed it.  Likewise, CSX blames Hitt and his union representative for not showing

CSX its rule requiring RCOs to immediately apply the emergency brakes, as Hitt did, when

confronted with an emergency situation.  In essence, CSX blames others for its upper-level

managers not considering its own rules.

Neither Rule 300.4 nor ABTH 5501.1 state that using the emergency brake is prohibited

for a banner test, and CSX admits that a banner simulates an obstruction which its radio rules classify as an emergency.

**B.     CSX Cannot Satisfy the Affirmative Defense.**

Because Plaintiff has created a question of fact as to whether his termination was a contributing factor to his injury report, CSX is only entitled to summary judgment if it proves "by clear and convincing evidence, that [they] would have taken the same unfavorable personnel action in the absence of [Hitt's protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(ii).  The U.S. Supreme Court has said that the clear-and-convincing standard is reserved to protect particularly important interests in a limited number of civil cases."  As mentioned earlier, this is "tough standard, and not by accident."  *Araujo*, 708 F.3d at 159.  (quoting *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)).

The ARB has explained that the "same decision" defense requires railroads to do more than simply offer evidence that the employee violated a work rule and that the railroad has disciplined other employees for similar violations.  *DeFrancesco v. Union Railroad Co.* ("*DeFrancesco II*"), ARB No. 13-057, ALJ No. 2009-FRS-009, 2015 DOL Ad. Rev. Bd. LEXIS 51, *21- at pp. 10-14 (ARB Sept. 30, 2015).  This evidence, standing alone, is not sufficient for two reasons.  First, the AIR-21 "same decision" defense requires the railroad to prove by clear and convincing evidence that it "**would have**" (not "**could have**") taken the same adverse action against the plaintiff in the absence of his protected activity.  49 U.S.C. § 42121(b)(2)(B)(ii).  Second, if such evidence were sufficient, the FRSA would lose much (if not all) its protection "against situations where an employer . . .  use[s] an employee's violation of a workplace . . . rule as pretext for discrimination against the employee for reporting an injury."  *DeFrancesco II*, 2015 DOL Ad. Rev. Bd. LEXIS 51, *20.

The affirmative defense is not proven when questions of fact exist as to whether the disciplinary charges were retaliatory.  See, *Araujo*, 708 F.3d. at 163.  Here, the text messages alone are sufficient evidence of retaliatory targeting to preclude summary judgment on the affirmative defense.

## CONCLUSION

For the foregoing reasons the Court should deny CSX's Motion for Summary Judgment and set this case for trial.

**BURGE & BURGE, P.C.**

/s/ F. TUCKER BURGE, JR.
F. TUCKER BURGE, JR.
F. TUCKER BURGE, SR.
2001 Park Place, Suite 1350
Birmingham, AL   35203
(205) 251-9000
(205)323-0512 (Facsimile)
Email:  ftbjr@burge-law.com
            tucker@burge-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th  day of February, 2023, I electronically filed the above and foregoing document with The Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record via the Court's electronic filing system

/s/ F. TUCKER BURGE, JR.
OF COUNSEL

DOCKET/TAB #

44

Case 2:21-cv-01720-RDP   Document 44   Filed 03/21/23   Page 1 of 21

USCA11 Case: 23-11899   Document: 14-7   Date Filed: 08/31/2023   Page: 49 of 97

FILED
2023 Mar-21  PM 09:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY HITT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO. 2:21-CV-01720-RDP** |
| **vs.** | ) | |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT CSX TRANSPORTATION, INC.'S
## REPLY TO PLAINTIFF'S SUMMARY JUDGMENT OPPOSITION

Thomas R. Chiavetta, Jr. *(admitted pro hac vice)*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile:  (202) 626-1700
tchiavetta@jonesday.com

M. Wade Richardson
RichardsonClement PC
22 Inverness Center Parkway Suite 500
Birmingham, AL 35242
Telephone: (205) 729-6050
Wade@Richardson.law

## TABLE OF CONTENTS

**Page**

I.   Hitt Cannot Prove that FRSA-Protected Conduct Contributed to His Discipline ............ 7

    A.   Hitt Misstates His Legal Burden of Proof........................................................... 7

    B.   Hitt Cannot Prove His Discipline Was Retaliatory.............................................. 9

        1.   Hitt's efforts to bridge the temporal gap between the lightning incident and the banner test are unavailing................................... 9

        2.   Hitt's attempt to distinguish CSX's comparators fails ........................... 11

        3.   Hitt's ongoing reliance on System Notice 100 is misplaced ................. 12

        4.   Hitt's reliance on rules that apply only in the event of an emergency is misguided............................................................. 13

        5.   Hitt's other arguments fall equally flat .................................................. 13

II.   Even if Hitt Could Prove Retaliation, CSX Is Entitled to Summary Judgment On Its Affirmative Defense..................................................................................... 14

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*,
   713 F.2d 618 (11th Cir. 1983) ................................................................10

*BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Rev. Bd.*,
   867 F.3d 942 (8th Cir. 2017) ................................................................15

*DeFrancesco v. Union R.R. Co.*,
   No. 13-057, 2015 WL 5921329 (ARB Sept. 30, 2015) ........................15

*Epple v. BNSF Ry. Co.*,
   785 F. App'x 219 (5th Cir. 2019) ..........................................................15

*Henderson v. FedEx Express*,
   442 F. App'x 502 (11th Cir. 2011) ........................................................11

*Koziara v. BNSF Ry. Co.*,
   840 F.3d 873 (7th Cir. 2016) ................................................................15

*Kuduk v. BNSF Ry. Co.*,
   768 F.3d 786 (8th Cir. 2014) ..................................................................9

*Majali v. U.S. Dep't of Labor*,
   294 F. App'x 562 (11th Cir. 2008) ..........................................................8

*Stone & Webster Constr., Inc. v. United States Dep't of Labor*,
   684 F.3d 1127 (11th Cir. 2012) ..............................................................8

*Thomas v. Tyco Int'l Mgmt. Co., LLC*,
   416 F. Supp. 3d. 1340 (S.D. Fla. 2019) ................................................10

STATUTES

42 U.S.C.
   § 5851(b)(3)(A)........................................................................................8

49 U.S.C.
   § 20109(d)(2)(A)......................................................................................7
   § 42121(b)............................................................................................7, 8

Energy Reorganization Act.........................................................................................................8

In opposing CSX's Motion for Summary Judgment, Plaintiff Jeremy Hitt does not dispute that the managers involved in deciding on his dismissal did not know of his alleged protected conduct.  Nor does he dispute that other employees have been disciplined for doing the same thing as he did – using the emergency brake to stop during a banner test.  He also does not challenge whether his discipline was consistent with CSX's disciplinary policy.  Rather, Hitt's entire case rests on his ability to prove that the manager who brought the disciplinary charges – Nick Smith – did so in retaliation for FRSA-protected conduct.  He cannot do so.

Hitt's only FRSA-protected conduct towards Smith, according to the Complaint, occurred "[a] year before . . . January 17, 2019" – *i.e.*, in January 2018, one year before the allegedly retaliatory charges.  Twisting his own words, Hitt now claims his protected conduct occurred in the summer of 2018.  Even then, however, at least four and as many as seven months elapsed before any adverse action was taken against him.  Hitt has no legitimate explanation for this delay.  Nor has Hitt proved disparate treatment.  Despite years of discovery, he has not identified a single CSX employee who used the emergency brake to stop during a banner test and was not disciplined.  By contrast, CSX has identified 7 other employees who were all disciplined for doing the same thing as Hitt did.  Hitt argues that these employees are not similarly-situated to him, because he was a remote control operator whereas they were locomotive engineers and conductors.  This is a distinction without a difference.  The same rules apply to both employees; the only difference is that one operates the engine using the throttle and the other operates the engine using a remote control device.  CSX's decision to charge and discipline those other employees demonstrates that Hitt's own charges and discipline were not retaliatory.

At bottom, despite alleging retaliation, Hitt's complaint is primarily that his discipline was unfair.  He points out, for example, that the banner was placed in a curve, and claims to have

reacted immediately upon seeing it.  However, whether Hitt believes he violated CSX rules is ultimately irrelevant.  Without anything tying the banner test to his alleged protected conduct, Hitt's retaliation claim necessarily fails.  Summary judgment should be granted to CSX.

### RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS[1]

2.      Disputed as to the third sentence, to the extent that it characterizes the frequency of communication between Yardmasters and RCOs as "constant."  (*See* Doc. 35-5, Hitt Decl. ¶ 2.)

8.      Disputed.  A banner test is used to test employee compliance with speed and train handling rules (Doc. 31-17, Whitt Tr. 22:9-23), and the banner itself simulates an EOT ("end of train" device) and not just any obstruction to the track.  (Doc. 35-11, p. 91 (System Notice 100 indicates the "situations the [simulated obstruction] devices will be used to simulate," and states that an approved simulated obstruction device has "a flashing red light that simulates an EOT" – *i.e.*, an "end of train" device); Doc. 35-11, Whitt Tr. 54:5-13 ("[t]he banner test is built . . . to simulate an EOT, end-of-train device"); Doc. 35-1, pp. 26-27 (Hearing Tr. 25:13-26:21).)

13.      Disputed as to the second sentence for which Plaintiff did not cite any support. At any given time there were a minimum of three to four and as many as ten to twelve crews on duty in Boyles Yard. (Doc. 36-1, Boyles Tr. 11:19–12:5.)

16.      Disputed. Smith generally did not have "direct supervision" of Boyles Yard employees (Doc. 35-12, Smith Tr. 44:23-45:5), but crews that went on duty in Boyles Yard traveled onto the Birmingham Mineral subdivision (Doc. 35-6, Hiers Tr. 27:9-15), Smith's primary area of responsibility (Doc. 35-12, Smith Tr. 21:14-22:15), and Train & Engine employees "can be

---

[1] Because Plaintiff is the non-moving party, the facts at this stage must be construed in the light most favorable to him. Accordingly, the facts to which CSX has not responded are undisputed for summary judgment purposes only. CSX reserves the right to dispute any of these facts at trial should one be deemed necessary.

supervised by any CSX manager who happens to be working in their area."  (Doc. 31-2, Dilday Decl. ¶ 4 n.1; Doc. 35-12, Smith Tr. 45:2-13.)

17.     Disputed insofar as it suggests that the lightning incident was sometime after the summer of 2018.  Smith testified that the lightning incident occurred in January (Doc. 35-12, Smith Tr. 43:9-24), which is consistent with what Hitt alleged in his Complaint.  (*See* Compl. ¶ 14.)

18.     Disputed.  When asked about his interactions with Boyles Yard RCOs, Smith also testified that he would occasionally do "[v]arious things" to help at the Terminal, including driving crews from one location to another.  (Doc. 35-12, Smith Tr. 37:5-20.)

24.     Disputed to the extent it refers to the locomotive as "their" – meaning Hitt and Corneglio's – locomotive.  Hitt testified during the disciplinary hearing that he was the "sole operator of the [locomotive] engine." (Doc. 31-4, p. 53.)  The utility person's role was merely to help Hitt and other RCOs with discrete tasks during their shift.  (*Id.*, Eady Tr. 67:7-10.)

25.     Disputed only to the extent it suggests, on the basis of incomplete testimony, that what prompted Hiers to stop was "not [ ] unusual."  While it was not unusual to see a locomotive coupled to a cut of cars in Boyles Yard, Hiers also testified that the engine appeared to be unattended (Doc. 35-6, Hiers Tr. 42:6-23), and ensuring that engines left unattended were properly secured was a focus of operational testing.  (Doc. 35-3, Hitt Tr. 53:22-54:1.)

26.     Disputed.  The statement falsely implies that Hiers made a conscious decision not to charge Corneglio.  In fact, Hitt was working a one-man remote control job (*id.*, Hitt Tr. 69:2-13), and Hiers did not know that Corneglio had been assisting Hitt.  (Doc. 35-6, Hiers Tr. 54:4-9.)  Thus, regardless of his interpretation of Rule 112.1, Hiers would not have had any reason to charge Corneglio.  The statement is also false insofar as it says that "Hiers agrees that under [Rule 112.1] Corneglio shared responsibility for the securement violation."  Hiers testified only

that if an RCO-certified utility man were aware that a locomotive was about to be left unattended without having been properly secured, then, under those circumstances, the utility man would share responsibility for the securement violation. (*Id.* 56:15-22.) In this case, however, Hiers did not know that Corneglio had been working with Hitt (*id.* 54:4-9), and there is no evidence that Corneglio knew that Hitt had not properly secured the engine. (*See, e.g.*, Doc. 31-4, pp. 43-54 (Hitt never claimed he told Corneglio that he had not had time to properly secure the engine); Doc. 35-3, Hitt Tr. 77:10-14 (Hitt never asked Corneglio to secure the engine for him).)

27.     Disputed. Smith does not remember one way or another whether he ever found that the disciplinary charges had not been proven. (Doc. 35-12, Smith Tr. 50:20-51:8.)

31.     Disputed only to the extent it suggests that the only tests performed were those required by System Notice to be performed during the first quarter of 2019. In addition to required tests, the team also tested for compliance with cell phone safety rules and ensured that crews had their proper paperwork. (*Compare* Doc. 35-21, Boyles Tr. 17:12-20:22, PX2 at p. 20 *with* Doc. 35-11 at pp. 108-112 (1st Quarter Operational Testing Requirements).)

33.     Disputed only to the extent it implies that there was only one trainmaster on duty at any given time. (Doc. 35-18, Hiers Tr. 14:19-15:22.)

34.     Disputed. CSX designated Hiers to testify as a 30(b)(6) witness on various topics including "the name of every employee who worked as the second-shift remote control operator on the Y293 job in January 2019." (Doc. 43-4, Chiavetta Decl. ¶ 2 & p. 7 (Plaintiff's 30(b)(6) Notice) ¶ 15.) He was asked, during his 30(b)(6) deposition, whether he was aware that Hitt was working the second shift Y293 job on January 21, 2019, and responded, "Yes." (Doc. 35-18, Hiers Tr. 16:13-16.) He did not, however, testify that, on January 21, 2019, he knew that Hitt was working the second shift Y293 job. Hiers worked the first shift that day. (*Id.* 15:10-22.)

37.     Disputed.  The testimony Plaintiff cites does not stand for the proposition asserted.  Don Boyles does not know whether Nick Smith performed any other operational tests at Boyles Yard on January 21, 2019.  (Doc. 35-21. Boyles Tr. 38:13-39:22.) Smith performed multiple operational tests throughout the day, including "some testing on the yard," but does not recall the details of those tests  (Doc. 35-12, Smith Tr. 67:23-70:25.)

38.     Disputed as to the first sentence, which is not supported by the testimony cited.  CSX does not dispute that Nick Smith's operational test records do not show any other banner tests of RCOs during the 4-year time period referenced.  However, Smith did not record every operational test he performed.  (Doc. 35-12, Smith Tr. 31:7-9.)

39.     Disputed insofar as the second sentence describes the location of the banner test as "the most severe curve in Boyles Yard."  All the tracks in that area of the yard have similar curvature. (Doc. 35-3, Hitt Tr. 92:1-93:2.)

42.     Disputed to the extent it implies that Smith was listening only to the 293 job.  After he set up the banner, Smith "was listening to the radio, listening to some movements that were made," and he "believe[d] the 293 job had made a move in the south yard and was getting ready to pull into the west yard."  (Doc. 35-1, at p. 8 (Hearing Tr. 7:15-20).)

44.     Disputed that Hitt's decision to switch the cars without air was "in accordance with routine practice."  The testimony cited does not support this assertion, and RCOs have discretion on whether to put air on the cars before making a move.  (*See* Doc. 31-10, p. 129 (RCO Training Manual) ("It is the remote control operators' responsibility to know when the automatic brake (train brake) is necessary to control switching or train movements associated with remote control. . . . Whenever a situation arises that you are unsure if the automatic brake is necessary to

control the movement: . . . Take the safe course and couple sufficient air brakes to control the movement."); *see also* Doc. 35-17, Pledger Tr. 23:21-24:8.)

45.    Disputed that Hitt "responded immediately" upon seeing the banner.  (*See* Doc 35-14 (Video of Banner Test) (banner is first visible at 3:10, and audio reveals that brakes were not applied until 5 seconds later); *see also* Doc. 31-10, Ammons Tr. 56:5-58:2.)

46.    Disputed as to the second sentence.  Hitt testified that he did not have any "slack problems"; he did not say that there was not "severe slack."  *See* Doc. 35-3, Hitt Tr. 154:14-15. Also disputed as to the third sentence.  (*See* Doc. 43-1, Ammons Decl. ¶ 2 ("Even when operating at relatively slow speeds and pulling less than 30 cars, an employee's use of the emergency brake can create rapid or severe slack changes depending on a variety of factors . . . .").)

47.    Disputed insofar as it is incomplete.  Smith also asked Hitt if he had used the emergency brake and whether he had air on the cars.  (Doc. 35-3, Hitt Tr. 97:1–8.)  When Hitt said that he had not put any air on the cars, Smith responded, "[W]ell, we . . . may need to start putting air on the cars," and Hitt agreed.  (*Id.*; Doc. 35-1, p. 29 (Hearing Tr. 28:1-13).)

51.    Disputed that the portion of testimony cited accurately represents Smith's testimony as a whole.  Smith testified that the particular banner test performed on Hitt was intended "to simulate a car in a track in which a train had just pulled out of."  (Doc. 35-1, p. 24 (Hearing Tr. 23:34-36).)  Also, disputed as to the last sentence to the extent it states that Smith's testimony that Hitt failed to stop within half the range of vision was "contrary" to the language of the charge letter.  The charge letter did not say one way or another whether Hitt stopped within half the range of vision, and said that the hearing would cover "all circumstances relating" to the incident under investigation.  (Doc. 35-1, p. 54 (Jan. 23, 2019 Charge Letter).)

52.     Disputed insofar as it states that Smith's testimony was the only evidence of Hitt's violations.  Hitt's own admission that he had used the emergency brake to stop during the banner test was sufficient to prove the violations in the minds of the managers who decided on Hitt's dismissal.  (*See* Doc. 31-2, Dilday Decl. ¶ 11; Doc. 31-8, Layne Decl. ¶ 8.)

53.     Undisputed that Hitt testified as such, but disputed that Hitt is correct in his belief that his use of the emergency brake posed no possible danger.  (*See* Doc. 43-1, Ammons Decl. ¶ 2.)

55.     Disputed only to the extent it falsely suggests that Dilday (as opposed to John Layne) was the final decision-maker on Hitt's dismissal.  (*See* Doc. 31-8, Layne Decl. ¶ 10; *see also* Doc. 31-2, p. 126 (Mar. 1, 2019 Email from Dilday to Donovan et al.).)

**I.      Hitt Cannot Prove that FRSA-Protected Conduct Contributed to His Discipline**

> **A.      Hitt Misstates His Legal Burden of Proof**

To prove retaliation, Hitt must establish that FRSA-protected conduct was a contributing factor in his discipline.  *See* 49 U.S.C. § 20109(d)(2)(A) (incorporating by reference the rules and procedures set forth in 49 U.S.C. § 42121(b)).  Courts have held that, in order to prove contributing factor causation, plaintiffs must prove "intentional retaliation" – *i.e.*, that the relevant decision-makers acted with a retaliatory motive.  *See* SJ Mem. 19 (citing cases).

Citing the Third Circuit's opinion in *Araujo* and other non-binding precedent (Opp. 27-28), Plaintiff argues that he need not prove that anyone involved in his discipline acted with a retaliatory motive.  He is wrong.  While it has not yet addressed the contributing factor standard specifically in the context of a FRSA claim, in cases under other similar whistleblower statutes, the Eleventh Circuit has held that the standard is met "if a retaliatory motive 'tends to affect in any way the outcome of the decision' to take an adverse action against an employee."  *See Majali v. U.S. Dep't of Labor*, 294 F. App'x 562, 566 (11th Cir. 2008).  Plaintiff must prove intentional retaliation.

Plaintiff also argues that, unlike in "traditional employment discrimination" cases, defendants in FRSA cases cannot avoid liability by showing that they honestly believed in the legitimate, non-retaliatory reasons given for the discipline. This, too, misreads the law. In assessing whether a retaliatory motive influenced the discipline decision, the court must necessarily assess whether any legitimate, non-retaliatory reasons given for the discipline were the real reasons or merely pretext for retaliation. This cannot be done without considering an "honest belief" defense. Indeed, under Eleventh Circuit law, failure to consider the honest belief defense in cases like this one is reversible error.[2] *See, e.g.*, *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012) (the Administrative Review Board erred by not considering what the decision-makers "honestly believed" about the conduct that prompted the dismissal). Plaintiff cannot pretend that the views of those who decided on his discipline are somehow irrelevant.

Lastly, to the extent he argues that CSX's position is that "it cannot be responsible for a charging officer's intentional retaliation as long as the managers who have a final say remain ignorant of the protected activities of the employee being punished," Plaintiff misrepresents CSX's argument. CSX does not dispute that cat's paw liability could potentially apply in a FRSA case. Rather, CSX argues that, in addition to being unable to prove that any of the managers who decided on his discipline retaliated against him – a fact he does not dispute (*see* Opp. 13, ¶ 57) – Plaintiff likewise cannot prove that either Smith or Hiers (the managers who brought the charges) retaliated against him.

---

[2] Although *Stone & Webster* arose under the whistleblower provision of the Energy Reorganization Act, that law is subject to the same standards and burdens of proof as the FRSA. *Compare* 42 U.S.C. § 5851(b)(3)(A) (requiring proof that ERA-protected conduct "was a contributing factor in the unfavorable personnel action") *with* 49 U.S.C. § 42121(b)(2)(B)(i) (incorporated by reference by the FRSA and requiring proof that FRSA-protected conduct "was a contributing factor in the unfavorable personnel action").

Moreover, even if he could prove that the charges were retaliatory (which he cannot), neither Hiers' nor Smith's alleged retaliatory motive can be imputed to any of the discipline decision-makers.  Hitt concedes that none of those managers knew of his alleged protected conduct.  *See* Opp. 13, ¶ 57.  And, although he claims that their discipline decision was "no more than a rubber stamp endorsement of the decision to charge," the undisputed evidence reveals otherwise.  *See, e.g.*, Doc. 31-2, pp. 126-28 (Mar. 1, 2019 email correspondence between Donovan, Dilday, and Layne debating whether Hitt should be terminated); *see also* Donovan Decl. ¶ 10 (Doc. 31-3); Layne Decl. ¶ 10 (Doc. 31-8).  In the end, Hitt's undisputed conduct – failing to properly secure the engine and using the emergency brake to stop during the banner test – was the sole basis for his discipline.  *See* Layne Decl. ¶ 10 (Doc. 31-8); Dilday Decl. ¶ 11 (Doc. 31-2); *cf. Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (rejecting cat's paw theory premised on charging officer's alleged bias where discipline was justified by undisputed facts).  He cannot prove retaliation.

## B.      Hitt Cannot Prove His Discipline Was Retaliatory

Even if he were not required to prove retaliatory animus, Hitt still could not prove that FRSA-protected conduct factored into his suspension or his dismissal.

### 1.      Hitt's efforts to bridge the temporal gap between the lightning incident and the banner test are unavailing.

Hitt does not claim to have engaged in any FRSA-protected conduct vis-à-vis Nick Smith other than when he allegedly refused to return to work during a lightning storm.  That incident, according to Plaintiff's complaint, occurred in January 2018.  *See* Compl. ¶ 14 ("A year before serving as the hearing officer on January 17, 2019, Trainmaster Smith had a confrontation with Mr. Hitt during a thunderstorm.").  This one-year gap between protected conduct and any disciplinary action undermines Hitt's retaliation claim.  *See* SJ Mem. 19-20.

Hitt attempts to rebut this evidence in two ways.  First, Hitt claims that, because he testified later that the lighting incident "probably" occurred in the summer of 2018, temporal proximity should be measured by that date and not by the January 2018 date.  Hitt does not dispute that "a party is bound by the admissions in his pleadings."  *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621-22 (11th Cir. 1983).  Instead, Hitt tries to reconcile his conflicting testimony by arguing that his Complaint "does not say that the lightning incident occurred in January 2018," and instead "generally alleges that [it] happened 'a year before' the January 21, 2019 banner test."  (Opp. 2 n.1.)  This claim does not pass muster.  Hitt did not allege that the lightning incident happened "the" year before his January 21, 2019 banner test; he claimed that it happened "a" year beforehand.  His Complaint cannot reasonably be interpreted as alleging that the lightning incident occurred in the summer of 2018.[3]

Moreover, even if the lightning incident had occurred in the summer of 2018, as Hitt now claims, there still would have been at least four and as many as seven months between his protected conduct and the banner test.  This, too, is too big of a gap to suggest retaliation.  *See Thomas v. Tyco Int'l Mgmt. Co., LLC*, 416 F. Supp. 3d. 1340, 1363 (S.D. Fla. 2019) (four month gap between protected activity and termination "defeat[ed] any plausible argument that [plaintiff's] protected activity could have been a contributing factor in her termination"); *see also Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (when three months or more elapse between protected conduct and discipline, no inference of causation).

---

[3] Moreover, his federal court Complaint was not the first time Hitt alleged that the lightning incident occurred in January 2018.  Hitt also alleged in his May 2019 OSHA Complaint and in a Bill of Particulars served on March 24, 2021 – in both cases, long before his deposition testimony – that the lightning incident occurred "[a] year before . . . January 17, 2019."  Doc. 43-4, p. 15 ¶ 9 & p. 30 ¶ 15. The OSHA complaint was filed just five months after the banner test whereas Hitt's deposition testimony occurred more than two-and-a-half years later.

Recognizing the damage that this evidence does to his case, Hitt attempts to minimize it by arguing that the large gap is not significant because, "[b]y his own admission, Smith is not certain that he worked as a relief supervisor at Boyles Yard even once between the lightning incident and the banner test." (Opp. 30.)  This argument is unavailing.  *First*, had he wanted to retaliate against Hitt, Smith could have charged him with insubordination for failing to return to work when he was first told to do so, or manufactured some other charges that day.  He did not do so.  *Second*, even when he was not covering an entire shift at Boyles Yard, Smith would occasionally help out there.  *See* Doc. 35-12, Smith Tr. 37:5-20.  He was not as absent from Boyles Yard as Plaintiff makes it seem.  *Third*, crews that went on duty on Smith's territory (the Birmingham Mineral) took trains to Boyles Yard and vice versa.  *See* Doc. 35-6, Hiers Tr. 27:9-15.  As a result, had he wanted to retaliate against Hitt, Smith certainly could have tested him sooner, whether in Boyles Yard or elsewhere.[4]  *Cf.* Doc. 31-2, Dilday Decl. ¶ 4 n.1 ("A T&E employee" – such as an RCO – "does not have only one supervisor; they can be supervised by any CSX manager who happens to be working in the area.").  The one-year gap between the lightning incident and the allegedly retaliatory banner test is as significant as it sounds.

2.     Hitt's attempt to distinguish CSX's comparators fails.

Hitt has not identified a single employee who was not charged or disciplined after using the emergency brake to stop during a banner test.  CSX, by contrast, identified 7 other employees who, like Hitt, used the emergency brake to stop during a banner test and were disciplined for doing so.  *See* SJ Mem. 17, ¶ 58.  Hitt argues that these comparators were not similarly situated to him because each of them "was either an engineer or a conductor on a train operated by an

---

[4] Moreover, Hitt claims that the banner test was a set-up not only by Smith but also by Hiers who, unlike Smith, was stationed at Boyles Yard and thus supervised Hitt much more frequently.  *See* Doc. 35-6, Hiers Tr. 19:1-10; Doc. 35-3, Hitt Tr. 43:10-11. Hiers certainly would have had the opportunity to test Hitt at some earlier date, as opposed to waiting until months after Hitt's alleged protected conduct to do so.

engineer with air on the cars of the train," and did not work in the same division as he did.  (Opp. 13, ¶ 58.)  These distinctions are immaterial.  The rules that Hitt and these other employees were charged with violating apply system-wide, regardless of (1) an employee's division, (2) the method by which the employee is operating the engine, or (3) whether the cars have air on them.  (Doc. 43-1, Ammons Decl. ¶¶ 3-4.)  The employees identified by CSX are legitimate comparators, and they demonstrate that Hitt's discipline was not retaliatory.

> 3.    Hitt's ongoing reliance on System Notice 100 is misplaced.

Even though CSX has disciplined other employees for using the emergency brake to stop during a banner test, Hitt maintains that employees are not prohibited from using the emergency brake under these circumstances, and that the charges were pretext for retaliation.  The cornerstone of his argument is System Notice 100, which, Hitt claims, says that the only thing an employee must do in order to pass a banner test is to stop without hitting the banner.  However, even though they were re-issued as part of System Notice 100 (which took effect on January 1, 2019, at 12:01 a.m.), the banner testing provisions (Items 109 and 110) were not new: the exact same content had been in System bulletins or notices dating back at least as far as 2016.  *See* Doc. 43-3, Whitt Decl. ¶ 2.  Yet, as CSX's comparator evidence shows, CSX has consistently disciplined employees who used the emergency brake to stop during a banner test, ***even when the employee stopped short of the banner***.  *See* Doc. 32, ¶ 58.  As a result, even if Hitt could show that his discipline was unfair, he cannot prove it was retaliatory.

> 4.    Hitt's reliance on rules that apply only in the event of an emergency is misguided.

Attempting to justify his use of the emergency brake, Hitt argues that "[e]ven CSX's corporate representative testified that a banner test simulates an emergency situation.  (Opp. 10, ¶ 44.)  This claim is false.  Hiers, the "corporate representative" to whom Hitt refers, was not

designated as a 30(b)(6) witness on this topic. *See* Doc. 43-4, Chiavetta Decl. ¶ 2 & Ex. 1. And given that Hiers had no involvement whatsoever in the disciplinary decision, his view on what a banner test is intended to simulate – which is at odds with the views of the actual decision-makers (Layne Decl. ¶ 8 (Doc. 31-8); Dilday Decl. ¶ 11 (Doc. 31-2)) – is ultimately irrelevant.

     5.     Hitt's other arguments fall equally flat.

The remaining evidence on which Hitt relies is likewise insufficient to survive summary judgment. He claims, for instance, that Smith's explanation for the apparent contradiction between his text message on the night of the banner test and his testimony nine days later – that his conclusion that Hitt failed to stop in half the range of vision was based on video evidence which he had not reviewed before he sent the text message – "could [be] rejected . . . as pure spin." (Opp. 32-33.) But Smith explained his conclusion the exact same way at Hitt's January 30, 2019 disciplinary hearing (Doc. 35-1, p. 46 (Hearing Tr. 45:12-24)) – years before the text messages were ever produced – and Hitt has not uncovered any evidence that Smith is lying.[5] Hitt's contention otherwise is pure speculation. And, even if he could prove that Smith targeted him, Hitt cannot show it had anything to do with his FRSA-protected conduct towards him one year earlier.

Lastly, Hitt claims that the video evidence demonstrates that he reacted immediately to the banner, and argues that he did not do anything unsafe, pointing out that he was traveling at 7 mph whereas the maximum speed limit was 15 mph.[6] However, what matters is not whether Hitt

---

[5] Hitt also claims that Smith's explanation for why he asked whether a banner test failure was a serious offense – which, Smith said, was because, at one time, it was a major offense – is "unsupported by evidence." (Opp. 32 n.4.) Hitt is wrong. Prior to 2015, CSX classified banner test failures as a major offense. *See* Doc. 43-2, Eady Decl. ¶ 3. Hitt cannot show that Smith was lying.

[6] In fact, the video evidence, which Hitt claims is exculpatory, actually reveals that he did not react immediately to the banner – there is a several second delay between when the banner can first be seen and when the emergency brake was applied. Doc. 35-14; *see also* Doc. 31-10, Ammons Tr. 56:5-58:2. What's more, while he complains about the banner being placed in a curve, Hitt could have seen the banner sooner had he positioned himself on the left side of the engine or on the engine's nose, as CSX's Director of Train Handling testified that Hitt

-13-

believes he acted appropriately or safely but rather whether the managers who decided on his discipline honestly believed that he violated the rules.  And, in fact, those managers concluded that discipline was appropriate based solely on his use of the emergency brake and not because of any disputed facts.  Hitt cannot prove retaliation.

## II. Even if Hitt Could Prove Retaliation, CSX Is Entitled to Summary Judgment On Its Affirmative Defense

Hitt does not dispute any of the facts that entitle CSX to summary judgment on the FRSA's affirmative defense.  Instead, Hitt argues that, assuming he can prove that FRSA-protected conduct factored into the charges, the affirmative defense is not a shield to liability for the later discipline.  This is incorrect.  The affirmative defense assumes that protected conduct factored into the discipline in some way.  To defeat the defense, a FRSA plaintiff must do more than simply show that, but-for the protected conduct, the discipline would not have happened. *See, e.g.*, *Epple v. BNSF Ry. Co.*, 785 F. App'x 219, 223 (5th Cir. 2019) (affirming judgment to employer on affirmative defense even though misconduct was discovered through investigation prompted by plaintiff's FRSA-protected injury report); *BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Rev. Bd.*, 867 F.3d 942, 949 (8th Cir. 2017) (rejecting notion that affirmative defense could not be established absent proof that employer would not have discovered misconduct but-for the protected activity); *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 879 (7th Cir. 2016) ("chain of events" theory insufficient to defeat affirmative defense).  "[T]he question is whether the same discipline . . . would have occurred were [CSX] aware of identical conduct" – *i.e.*, Plaintiff's

---

should have done.  *See* Doc. 31-10, Ammons Tr. 56:11-58:2.  Instead, Hitt was inside the engine's cab, standing on the right side.  *Id.* Lastly, regardless of the track's maximum speed limit, under the conditions present at the time of the banner test, CSX reasonably believed that Hitt should have been going slower than he was going.  *See id.* 43:10-45:10 (Hitt should not have been going faster than 4 mph through that curve).  In fact, even one of Hitt's non-management co-workers testified that he would not have taken the turn faster than 4 mph whereas Hitt was traveling at nearly twice that speed (Doc. 35-17, Pledger Tr. 46:14-50:4), a significant difference given the size and weight of trains.  Hitt cannot show that his discipline was unfair, let alone that it was retaliatory.

failure to properly secure the engine and his use of the emergency brake to stop during the banner test – "in the absence of [FRSA-protected conduct]." *DeFrancesco v. Union R.R. Co.*, No. 13-057, 2015 WL 5921329, at *6 (ARB Sept. 30, 2015); *see also Koziara*, 840 F.3d at 879.

Here, the answer to that question is undoubtedly "yes." Plaintiff's discipline was consistent with CSX's disciplinary policy and with discipline assessed to similarly-situated employees. *See* SOF ¶¶ 35, 37, 46, 58. Moreover, although Hiers and Smith were supposedly bad actors, in the eyes of the decision-makers (none of whom knew of Plaintiff's protected conduct), the undisputed facts alone – Hitt's admission that he failed to properly secure the engine and that he used the emergency brake to stop during the banner test – were sufficient to warrant discipline. (Doc. 31-2, Dilday Decl. ¶¶ 8, 11; Doc. 31-8, Layne Decl. ¶ 10.) There is therefore no doubt that an employee who did the same thing as Hitt would receive the same discipline as Hitt did, regardless of any FRSA-protected conduct – the comparator evidence proves it. CSX is entitled to summary judgment on its affirmative defense.

Date:  March 21, 2023

Respectfully submitted,

*/s/Thomas R. Chiavetta*
Thomas R. Chiavetta (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(202) 879-3975
tchiavetta@jonesday.com

Troy G. Mattila  (admitted *pro hac vice*)
JONES DAY
250 Vesey St.
New York, NY 10281
(212) 326-3628
tmattila@jonesday.com

M. Wade Richardson
RichardsonClement PC
22 Inverness Center Pkwy, Suite 500
Birmingham, AL 35242
(205) 729-6050
wade@richardson.law

*Attorneys for Defendant*
*CSX Transportation, Inc.*

-16-

**CERTIFICATE OF SERVICE**

I hereby certify that on March 21, 2023, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification to all counsel of record.

<u>/s/Thomas R. Chiavetta</u>
Thomas R. Chiavetta (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(202) 879-3975
tchiavetta@jonesday.com

DOCKET/TAB #

45

FILED

2023 May-11  PM 05:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| JEREMY HITT, | } |
| | } |
|      **Plaintiff,** | } |
| | } |
| **v.** | }    **Case No.:  2:21-CV-1720-RDP** |
| | } |
| CSX TRANSPORTATION, INC., | } |
| | } |
|      **Defendant.** | } |

**MEMORANDUM OPINION**

In this case, Plaintiff Jeremy Hitt has sued his former employer Defendant CSX. He claims CSX retaliated against him in violation of the Federal Rail Safety Act ("FRSA"). This matter is currently before the court on Defendant CSX Transportation, Inc.'s Motion for Summary Judgment. (Doc. # 26). The Motion has been fully briefed. (Docs. # 32, 38, 44). After careful review, and for the reasons discussed below, Defendant's Motion for Summary Judgment (Doc. # 26) is due to be granted.

**I.      Background[1]**

**A.      Plaintiff's Employment at CSX**

Plaintiff Jeremy Hitt was employed by Defendant CSX from 2005 to January 2019. (Doc. # 31-13 at 5). Over the course of his nearly fifteen years working for Defendant, he served as a conductor, a remote-control operator ("RCO"), and a foreman. (*Id.*). At all times relevant to

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

this case, Plaintiff worked at Boyles terminal, a train yard in Birmingham, Alabama ("Boyles"). (*Id*.).

Plaintiff began at CSX working as a conductor, but was selected for a promotion to RCO in early 2006. (*Id*.). To become an RCO, Plaintiff underwent a combination of classroom and on-the-ground training. (*Id*.). This training required Plaintiff to learn the rules of operating a locomotive and to conduct simulations that included drills and real-life scenarios an RCO might encounter. (*Id*.). Brandon Lindsey, Blake Miller, and Dennis Duck were the CSX employees who conducted Plaintiff's training. (*Id*.). While training for the RCO position, Plaintiff learned that the safest speed at which a locomotive can travel when carrying a "cut" of cars (*i.e.*, several cars coupled together) is 7 miles per hour. (*Id*.).

**B**.      **CSX's Disciplinary Process**

Defendant's disciplinary process for non-management employees is as follows: first, when a rule violation is observed, a manager or group of managers drafts an "assessment," which is a record describing the violation. (Doc. # 31-4 ¶ 2). Then, the violation is reviewed and classified by Field Administration as either a "major" offense or a "non-major" offense, which is defined in CSX's disciplinary policies. (*Id*.). CSX's recordkeeping system keeps track of the number of violations or offenses an employee has committed. (*Id*. ¶ 4). An employee who commits a second non-major offense may invoke his right to a hearing and face a potential three-day suspension if found guilty of the second offense, or he may waive his right to a hearing and receive a one-day suspension. (*Id*. at 9). An employee who commits a third non-major offenses in a three-year period faces a five-day suspension or termination. (*Id*. ¶ 4; p. 9).

### C.    Plaintiff's First Rule Violation

In July 2017, Plaintiff was charged with his first rule violation: failing to "take proper precaution when switching cars, resulting in a bypass derailment." (Doc. # 31-13 at 72). Plaintiff waived any right to contest the violation and received a formal reprimand. (*Id.* at 16-17).

### D.    The 2018 Lightning Storm

During the summer of 2018, Plaintiff was working as an RCO on a "pulling job," which involved the transfer of train cars between tracks. (Doc. # 31-13 at 7). Work was temporarily suspended due to a lightning storm in the area. (*Id.*). CSX policy requires its employees to go inside at the first indication of lightning, and forbids its employees from returning to work until at least thirty minutes after the last thunder roll or lightning strike. (*Id.*). On this occasion, after about ten minutes waiting for the storm to pass, train master Nick Smith called and told Plaintiff that it was time to get back to work. (*Id.* at 8). Smith was not at the same site as Plaintiff at this time. Smith did not typically work at Boyles. (*Id.*). Smith usually worked at Birmingham Mineral, a subdivision in Bessemer, Alabama. (*Id.*). Fifteen minutes later, Smith called again and told Plaintiff to get back to work because there was no more lightning. (*Id.* at 9). Plaintiff disagreed, and told Smith that he was watching the weather out the window and was still seeing lightning strikes. (*Id.*). Ten or fifteen minutes after that, Smith called a third time and reiterated his order to get back to work. (*Id.*). Plaintiff responded that he would do so, but only after thirty minutes had passed since the last lightning strike. (*Id.*).

Smith then told Plaintiff that the yard was getting backed up and that if Plaintiff was unwilling to go back to work before the thirty minutes had elapsed, they would "have to bring in somebody else … who will get it done." (*Id.*). Plaintiff testified that, during this third call, it appeared to him that Smith was growing irritated by Plaintiff's refusal to get back to work. (*Id.*).

About forty-five minutes after the first lightning strike, Smith drove to where Plaintiff was located to again order him back to work. (*Id*. at 10). Plaintiff informed Smith that because it had only been fifteen minutes since the last lightning strike, he would go back to work in another fifteen minutes. (*Id*.). Smith repeated his order and threatened to relieve Plaintiff of his duty if he did not get back to work immediately. (*Id*.). Plaintiff responded that he understood, but that the rules required him to wait for fifteen more minutes before going back to work. (*Id*.). Smith said "okay" and drove off. (*Id*.).

After Smith had left Boyles, Plaintiff discussed the day's events with another train master, whose name Plaintiff could not remember. (*Id*. at 10-11). That train master agreed with Plaintiff that Smith "was being ridiculous" in ordering Plaintiff back to work; he encouraged Plaintiff and thanked him and his fellow yard employees for their work. (*Id*. at 11).

### E.    Speed in the Railyard

Despite CSX teaching its employees that seven miles per hour was the safest speed to operate trains in the yard, it was common for managers to encourage employees to work faster and to be more efficient. On the same day as the 2018 lightning storm, for example, Smith told Plaintiff that once he returned to work, he would need to "pick it up" in order to make up for the time lost waiting out the storm. (*Id*.). When Plaintiff responded that the safest speed for a cut of cars is seven miles per hour, Smith replied that "we need to move faster." (*Id*.). The speed of the locomotive was controlled by a remote control, and after seven miles per hour, the next fastest setting was ten miles per hour. (*Id*.).

During the fall of 2018, Plaintiff had a similar conversation with another manager, Josh Hiers. (*Id*. at 12). Hiers would frequently tell his employees that they needed to give a little more, move a little faster, and be a little more efficient. (*Id*.). Plaintiff responded, as he had to

Smith, that seven miles per hour was the safest speed. (*Id*.). Like Smith, Hiers responded that Plaintiff needed to move a little faster. (*Id*.). The employees understood Smith and Hiers to be instructing them to go ten miles per hour in the yard because that was the next fastest setting after the seven miles per hour setting. (*Id*.). Nevertheless, Plaintiff maintained his remote control speed at seven miles per hour. (*Id*. at 13).

### F.   Plaintiff's Second Rule Violation: November 2018 Securement Issue and Subsequent Suspension

On November 25, 2018, Plaintiff was working as an RCO on a one-man crew dragging a cut of cars to tie the cars down, engaging the handbrakes, and leaving them at the yard. (*Id*.). A "utility man" was working with Plaintiff, and was helping to secure the cars by applying and then testing the handbrakes. (*Id*.). Plaintiff started to feel nauseous and determined that he needed to get to a bathroom immediately. (*Id*.). He instructed his utility man to drive him to "the hump" so that he could use the bathroom there. (*Id*.). Plaintiff then tied down the engine using the handbrake, switched off the remote box, and radioed the yard master that he would be gone for a few minutes. (*Id*)

Plaintiff had received training on the proper way to secure an engine left unattended, and understood that he was supposed to secure it with a handbrake, isolate the start/stop switch, and lower the generator field switch. (*Id*.). Despite this instruction, because he considered the circumstance an emergency, Plaintiff applied the handbrake but failed to isolate the start/stop switch or lower the generator field switch. (*Id*. at 21). Plaintiff was gone for about seven or eight minutes, and when he returned, train master Hiers was waiting for him. (*Id*. at 22). When Hiers asked whether he had secured the engine before leaving it unattended, Plaintiff told Hiers that he applied the handbrake but did not take the remaining required steps. (*Id*.). Hiers told Plaintiff that he would likely be charged with a rule violation as a result. (*Id*.).

Plaintiff elected to proceed to a hearing on the charge of failing to properly secure a locomotive engine left unattended rather than accept responsibility and a one-day suspension. (*Id.*). At the hearing, held in January 2019, train master Nick Smith was the presiding officer. (*Id.* at 23). Plaintiff was wary of Smith's involvement because the two had had run-ins in the past, including the confrontation during the summer 2018 lightning storm. (*Id.*). Ultimately, Plaintiff admitted at the hearing that he left the engine without following all the steps required to secure it. (*Id.*). Under CSX policy, because the securement violation was Plaintiff's second non-major offense, Defendant assessed Plaintiff a three-day suspension. (*Id.*).

### G.     Plaintiff's Third Rule Violation: 2019 Banner Test and Dismissal

A banner test is an operational test that simulates an obstruction on the track. (*Id.*). A "banner" is a large cone with flags sticking out of its side and a flashing red light on top. (*Id.* at 24-25). The purpose of a banner test is to ensure compliance with Operating Rule 300.4 that requires a train operator to operate at a speed that allows him to stop within half the range of vision from an obstruction. (Doc. # 31-17 at 7, 28).

In January 2019, Plaintiff was pulling cuts of cars from the receiving yard to the departure yard when he was subjected to a "banner test" initiated by Nick Smith and Josh Hiers. (*Id.* at 22-24); (Doc. # 35-6 at 21-22). Smith testified that he did not know that Plaintiff was the employee being tested. (*Id.*); (Doc. # 35-12 at 22). Hiers does not recall helping Smith set up the test but cannot rule out that he did so. (*Id.*); (Doc. # 35-6 at 21-22).

Plaintiff was travelling at seven miles per hour with a cut of about 20 cars when he first saw the banner about 150 or 200 feet in front of the train. (Doc. # 31-13 at 25-26). When he saw the banner, Plaintiff pulled the emergency brake lever and was able to stop the train about 100 to 150 feet from the banner. (*Id.* at 26). Plaintiff testified that he "absolutely" would not have been

able to stop within one half of the range of vision as required by the rule if he had not applied the emergency brake. (*Id*).

After he had stopped the train, Plaintiff was met by Smith who told him that he had done well by stopping when he did. (*Id*.). Smith then asked whether Plaintiff had used the emergency brake to stop, and Plaintiff responded that he had. (*Id*.). Smith also asked whether Plaintiff had "air on the cars" (reservoirs of pressurized air used for braking), to which Plaintiff responded that he did not. (*Id*.). Plaintiff thought Smith seemed satisfied because he told Plaintiff to signal the yard master and proceed with his work. (*Id*.).

At the end of his shift, however, Smith approached Plaintiff and told him that he had failed the banner test by applying the emergency brake. (*Id*. at 27). Smith told Plaintiff that he had violated Rule 300.4. (*Id*. at 28). The rule does not mention the emergency brake, but Smith stated that it was "implied" that deploying the emergency brake would result in a failure of the banner test. (*Id*.). Plaintiff was surprised to hear this because typically an employee who fails a banner test is immediately pulled out of service, yet Smith had instructed Plaintiff to continue working. (*Id*.).

Plaintiff was charged under Rule 300.4 and Air Brake Train Handling Rule 5501.1 (the latter prohibits locomotive operators from making "rapid or severe slack changes"). (*Id*. at 29). He was placed on administrative leave without pay pending the hearing. (*Id*.). At the hearing, Plaintiff was found guilty of violating Rules 300.4 and 5501.1, and the hearing officer, Gary Adkins, sent his findings to Superintendent Mike Dilday. (Doc. # 31-2 at 69, 122). A member of CSX's Labor Relations group suggested that Plaintiff be suspended; however, because it was Plaintiff's third offense, Dilday recommended dismissal. (Doc. # 31-8 ¶ 10). General Manager John Lane -- the ultimate decisionmaker -- agreed with Dilday and determined that Plaintiff

should be dismissed. (*Id*). On March 1, 2019, Defendant issued Plaintiff a letter of termination citing his violation of rules 300.4 and Rule 5501.1. (Doc. # 31-13 at 30).

Defendant's Director of Train Handling Rules and Practices, Steve Ammons, testified that the rules Plaintiff violated -- Rules 300.4 and 5501.1 -- apply to all CSX train operators, regardless of division or manner of operation. (Doc. # 43-1 ¶ 3-4). Defendant submitted Rule 56 evidence indicating that several employees between May 2016 and January 2020 were charged with failing a banner test even though they stopped short of the banner because they did so by deploying the emergency brake. (Doc. # 31-4 ¶ 10; Doc. # 31-5 at 3-63; Doc. # 31-6 at 3-79; Doc. # 31-7 at 3-95; Doc. # 43-1 ¶ 3-4).

Plaintiff exhausted his administrative remedies through the Department of Labor. (Doc. # 1). On December 29, 2021, filed this action alleging that Defendant violated the Federal Rail Safety Act ("FRSA"). (*Id*.).

## II.  Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.

## III.   Discussion

 Plaintiff's Complaint asserts one claim against Defendant for retaliation under the

FRSA, 49 U.S.C. § 20109. (Doc. # 1 at 11-14). The FRSA prohibits railroad carriers from taking

adverse actions against employees who participate in any of several enumerated protected

activities regarding railroad safety. *See* 49 U.S.C. § 20109(a)-(b).

Plaintiff alleges that he was disciplined, suspended, and terminated in retaliation for

activity that is protected under the FRSA. (*Id.*). Specifically, Plaintiff alleges he engaged in the

following protected activity:

> (a) refusing to operate remote control switching movements at greater than
> "restricted speed" based on his good faith belief that to do so would be unlawful;
> (b) refusing to yield to pressure from supervisors to perform remote control
> switching movements at greater than 7 m.p.h. based on his good faith belief that
> doing so was unsafe and contrary to his RCO training; (c) reporting to CSX[]
> managers who pressured him to perform remote control movements at faster
> speeds that he would not do so based upon his good faith belief that to do so
> would be unlawful and unsafe; (d) notifying CSX[] of his illness at work on
> November 25, 2018; (e) Refusing Trainmaster Smith's instruction to resume
> switching during a lightning storm.

(Doc # 1 ¶ 24). Thus, the protected activity most pertinent here is "to refuse to violate or assist in

the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49

U.S.C. § 20109(a)(2).

Plaintiff further alleges that the following adverse actions were taken against him in

retaliation for his protected activity:

> (a) subjecting him to harassment and increased scrutiny due, in whole or in part,
> to his FRSA protected activities; (b) staging a banner test in a sharp curve at night
> to increase the likelihood that Plaintiff would fail; (c) accusing Plaintiff of
> violating CSX[] Operating Rule 300.4 by using the emergency brake in response
> to a banner test when that rule does not mention, much less prohibit emergency

brake use; (d) accusing Plaintiff with violating CSX[] Air Brake Train Handling Rule 5501.1 by using the emergency brake in response to a banner test when that rule does not mention, much less prohibit emergency brake use; (e) accusing Plaintiff of failing a banner test by not stopping within one-half of his range of vision during the hearing when such a charge was not included in the charge letter and Trainmaster Smith made no measurements and could not remember how many steps he took between that banner and the stopped train; (f) issuing disciplinary charges against Plaintiff on November 28, 2018; (g) convening a formal disciplinary hearing against Plaintiff on January 17, 2019; (h) pulling Plaintiff out of service on January 21, 2019; (i) issuing disciplinary charges against Plaintiff on January 23, 2019; (j) convening a formal disciplinary hearing against Plaintiff on January 30, 2019; (k) issuing a 3-day suspension against Plaintiff on February 15, 2019; (l) terminating Plaintiff on March 1, 2019.

(*Id*. ¶ 25).

Defendant argues that, even if Plaintiff could establish that "he engaged in FRSA-protected conduct, [he] cannot show that CSX retaliated against him." (Doc. # 32 at 23). Further, Defendant maintains that even if Plaintiff could establish his retaliation claim, CSX is entitled to summary judgment because it would have issued the same discipline to Plaintiff regardless of his alleged protected conduct. (*Id*. at 32-33).

### A.      Retaliation Under the FRSA

The Eleventh Circuit has not adopted a specific test for FRSA retaliation claims. However, "[d]istrict courts in the Eleventh Circuit analyze FRSA retaliation claims under the four-element test established by the Third Circuit in *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013)." *Shearrer v. Norfolk S. Ry. Co.*, 2021 WL 871356, at *4 (N.D. Ala. Mar. 9, 2021) (collecting cases). "[Under] that test, a successful retaliation claim under the FRSA requires proof of four elements: (1) the employee engaged in an activity protected by the FRSA; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an adverse employment action; and (4) the protected activity was a contributing factor in the adverse employment action." *Shearrer*, 2021

11

WL 871356 at *4 (citing *Araujo*, 708 F.3d at 157). These elements are derived from the Wendell H. Ford Aviation and Investment Reform Act for the 21st Century, 42 U.S.C. § 42121(b) ("AIR21"). The burdens of proof found in AIR21 apply to FRSA retaliation claims. 49 U.S.C. § 20109(d)(2)(A)(i) ("Any [retaliation action] shall be governed by the legal burdens of proof set forth in [AIR21]."); *see* 29 C.F.R. § 1979.104(b)(1) (setting out the same elements for an AIR21 retaliation claim as those set out in *Araujo* for a FRSA retaliation claim).

Here, it is undisputed that Plaintiff engaged in protected activity by refusing to engage in rule violations during the summer of 2018 related to working after lightning and speed in the railyard. (Doc. 31-13 at 7-13).

The Eleventh Circuit has not addressed the applicable definition of "adverse employment action" in the FRSA retaliation context. However, in a case brought under the Surface Transportation Assistance Act, 49 U.S.C. § 31105 ("STAA") (under which -- like the FRSA -- retaliation claims are governed by the burdens of proof found in AIR21), the Eleventh Circuit relied on the principles of what constitutes an "adverse employment action" under Title VII of the Civil Rights Act of 1964. *Shearrer*, 2021 WL 871356 at *4 (citing 49 U.S.C. §§ 20109(d)(2)(A)(i), 31105(b); *Jacobs v. U.S. Dep't of Labor*, 806 F. App'x 832, 835 (11th Cir. 2020) (in turn citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006), and *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)). That standard provides that in the retaliation context an adverse employment action is an action that "produces an injury or harm" and would dissuade a reasonable worker from engaging in protected conduct. *Burlington*, 548 U.S. at 67-68 (quotation and citation omitted). Here, Plaintiff identifies the adverse employment action at issue to be the January 2019 banner test and his eventual termination. Certainly,

Plaintiff's termination constitutes actionable adverse employment actions. The court assumes without deciding that administration of the banner test does as well.

In their briefing on this Motion, the parties' main dispute centers on whether the alleged protected activity was a contributing factor to the setting of the banner test and Plaintiff's eventual termination. Under the FRSA, protected activity is a "contributing factor" to an adverse employment decision if it, "alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158 (quoting *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 567 (5th Cir. 2011)).

Plaintiff argues that the following circumstantial evidence indicates that his protected activity was a contributing factor in his eventual termination: (1) temporal proximity between the hearing for Plaintiff's securement violation and the banner test; (2) indications of pretext, and (3) the decisionmakers' awareness of Plaintiff's protected conduct. (Doc. # 38 at 32-3). The court addresses these arguments below.

### 1.    Temporal Proximity

It is true that temporal proximity can, in certain circumstances, satisfy the burden of establishing that the protected conduct was a contributing factor. *See* 29 C.F.R. § 1979.104(b)(2) ("Normally the burden [of proving a 'contributing factor'] is satisfied, for example, if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action."). But, again borrowing from the Title VII context, our circuit has made clear that "mere temporal proximity, without more, must be 'very close.' ... A three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (citations omitted).

Here, an examination of temporal proximity does not weigh in favor of a finding that Plaintiff's protected conduct was a "contributing factor" in any discipline against him or his termination. Plaintiff testified that his protected conduct -- the lightning storm and speed in the yard issues -- occurred during the summer of 2018. (Doc. # 31-13 at 7). Plaintiff was not charged with the securement violation until November 2018, approximately three months after Plaintiff pushed back to Smith about the lightning storm and speed in the yard. Moreover, the hearing regarding the securement violation, which preceded Plaintiff's three-day suspension, did not occur until January 2019, almost five or six months after the above-referenced protected conduct. The temporal proximity between Summer 2018 and January 2019 is not close enough to raise a reasonable inference of causation. *See Thomas*, 506 F.3d at 1364 (three to four-month disparity between the statutorily protected expression and the adverse employment action is not enough.)

Perhaps recognizing this lengthy time gap between the protected activity and his termination, Plaintiff asks the court to consider the temporal proximity issue in the unique context of this case. Plaintiff argues that Smith did not retaliate against him earlier than January 2019 because he did not have the opportunity to do so, as Smith did not regularly work at Boyles. (Doc. # 38 at 33). Plaintiff points out that the January 2019 securement violation hearing (which Smith presided over) was the first time since the lightning incident that Plaintiff and Smith had spoken. (*Id.*). In other words, Plaintiff seeks to bridge the significant temporal gap between his protected activity and the three-day suspension by arguing that Smith retaliated against him at his first real opportunity to do so.

The Eleventh Circuit has noted that a plaintiff may overcome a significant time gap between protected activity and the adverse employment action taken against him by offering additional evidence showing that the adverse action was the "first opportunity" for the employer

or a decisionmaker to retaliate. *Jones v. Suburban Propane, Inc.*, 577 F. App'x 951, 955 (11th Cir. 2014)[2] ("[t]he burden may be satisfied, for example, if the complaint shows that the adverse action took place shortly after the protected activity, or at the first opportunity available to the respondent, giving rise to the inference that it was a contributing factor in the adverse action"); *see also* 29 C.F.R. § 1982.104 (2015).[3]

But here, Plaintiff's argument falls flat for two reasons. First, as addressed before in more detail, Smith is not a decisionmaker here. (Note: The court addresses *infra* the separate question of whether Smith can be characterized as a cat's paw.). Second, and in any event, the Rule 56 record evidence contradicts Plaintiff's assertion that January 2019 was Smith's first opportunity to retaliate against him. Smith's testimony is undisputed that he visited Plaintiff's railyard "every once in a while" to "brief employees" and to "provid[e] rides for crews." (Doc. # 35-12 at 12). Further, Smith would "sporadically" cover for other employees in the Birmingham railyard. (*Id.* at 13-14). Thus, the Rule 56 record does not support the inference that Smith had no opportunity to retaliate against Plaintiff before January 2019. Therefore, Plaintiff's temporal proximity argument fails.

### 2.    Indications of Pretext

Plaintiff next argues that circumstances surrounding the banner test that led to his termination provide indications of pretext. First, Plaintiff points out that Smith set up a banner test four days after the securement hearing and Plaintiff claims Smith knew he was likely to fail.

---

[2] In *Suburban Propane*, the Eleventh Circuit addressed a retaliation claim under 42 U.S.C. § 1981. In the absence of express authority to the contrary, this court concludes that the standards governing substantially similar statutes, which serve substantially similar purposes, should be applied consistently. Therefore, the Eleventh Circuit's reasoning in *Suburban Propane* is apposite to this FRSA case.

[3] Although § 1982.104 governs administrative investigations conducted by OSHA under the FRSA rather than district court proceedings, it is instructive as to the "first opportunity" issue and supports the conclusion that a plaintiff may bridge a significant temporal gap by introducing evidence that the defendant retaliated against him at the first available opportunity.

(*Id.*). Plaintiff also argues that the test itself was evidence of retaliatory animus because he was the only RCO ever charged by CSX for failing a banner test without running into the banner. (Doc. # 38 at 36).

However, Defendant submitted Rule 56 evidence that between May 2016 and January 2020, several employees were charged with failing a banner test, even in circumstances when they stopped short of the banner, because they did so by deploying the emergency brake. (Doc. # 31-4 ¶ 10; Doc. # 31-5 at 3-63; Doc. # 31-6 at 3-79; Doc. # 31-7 at 3-95). Plaintiff counters that none of those employees are proper comparators to him because they were engineers and conductors rather than RCOs. (Doc. # 38 ¶ 58).

Plaintiff's attempts to distinguish those cases from his own are unpersuasive. Defendant's Director of Train Handling Rules and Practices, Steve Ammons, testified – and it is undisputed -- that the rules Plaintiff was dismissed for violating (Rules 300.4 and 5501.1) apply to all CSX train operators, regardless of division or manner of operation. (Doc. # 43-1 ¶ 3-4). Indeed, applying the same discipline to Plaintiff that other operators across the railroad company's divisions were subjected to actually evidences consistency in rule application, and not on its face any retaliatory motive.

Moreover, Smith testified that he did not know that Plaintiff was the employee being tested during the banner test. (Doc. # 35-12 at 22). Hiers does not recall helping Smith set up the test but cannot rule out that he did so. (Doc. # 35-6 at 21-22). Plaintiff's speculation that Smith and Hiers knew it was Plaintiff they were testing based on a generic reference in an email -- "the employee we are testing" -- is insufficient to create an issue of fact regarding Smith's clear and undisputed deposition testimony that he was not aware that Plaintiff was the "employee" they were testing. *See Celotex,* 477 U.S. at 325 ("Rule 56(e) ... requires the nonmoving party to go

beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"); *Anderson*, 477 U.S. at 252 (mere assertions or conjecture are insufficient to defeat a motion for summary judgment).

Plaintiff was one of many employees Defendant charged for using the emergency brake to stop short of the banner. Plaintiff has provided no evidence that the rules were applied to him in an inconsistent manner. Therefore, the Rule 56 record does not support the inference that the reasons for the banner test and  Plaintiff's termination for failing the banner test were pretextual.

### 3. Decisionmakers' Awareness of Plaintiff's Protected Conduct and "Cat's Paw Liability"

Another glaring problem with Plaintiff's theory is that Smith was not a decisionmaker regarding Plaintiff's discharge. Plaintiff was placed on administrative leave without pay pending the hearing on his banner test failure. At the hearing, Plaintiff was found guilty of violating Rules 300.4 and 5501.1, and the hearing officer, Gary Adkins, sent his findings to Superintendent Mike Dilday. (Doc. # 31-2 at 69, 122). A member of CSX's Labor Relations group suggested that Plaintiff be suspended; however, because it was Plaintiff's third offense, Dilday recommended dismissal. (Doc. # 31-8 ¶ 10). General Manager John Lane -- the ultimate decisionmaker -- agreed with Dilday and decided Plaintiff should be dismissed. (*Id*).

Plaintiff has presented no evidence that any of these decisionmakers were aware of his protected conduct. Instead, Plaintiff argues that retaliation was a motivating factor in Smith's decision to set up the banner test and that Smith's retaliatory motive in doing so can be imputed to CSX. The agency principle of "cat's paw" liability holds that an employer may be liable for discrimination when the actual decisionmaker had no discriminatory animus but is "influenced by a subordinate supervisor's action that is the product of such discriminatory animus." *Sims v.*

17

*MVM, Inc*., 704 F.3d 1327, 1335 (11th Cir. 2013). The Supreme Court has also considered cat's paw liability under a "contributing factor" standard. The Court has held that an employer can be held liable under an employment discrimination statute that calls for a "contributing factor" causation standard if: (1) a supervisor performs an act motivated by the sort of discriminatory animus contemplated under the relevant statute; and (2) that animus is intended by the supervisor to cause an adverse employment action. *Staub v. Proctor Hosp*., 562 U.S. 411, 422 (2011).

However, as discussed above, Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact that Smith knew it was Plaintiff who was being banner tested. Plaintiff argues that a reasonable jury might "reject Trainmaster Smith's claim that he was unaware [Plaintiff] was the employee being tested." (Doc. # 38 at 34). But, Plaintiff does not get to a jury without presenting substantial evidence, as opposed to speculation, from which a jury could infer that Smith was aware it was Plaintiff being tested. Without such evidence, Smith's testimony that he was unaware is unrebutted.

Plaintiff contends that a jury might reject such a claim based on (1) Hiers's testimony that he "constantly" monitored the yard crews under his supervision; (2) a text message Smith sent to a supervisor talking about "the employee" they were testing Plaintiff; and (3) Smith's arrival at the train yard two hours before the banner test. (*Id*. at 34-35). Plaintiff further argues that the test itself was "both irregular and unprecedented." (*Id*. at 35).

While managers are required by federal law and CSX policy to conduct quarterly tests of its train operators, Plaintiff is correct that banner tests were not among those tests *required* to be performed in the first quarter of 2019. (*See* Doc. # 35-11 at 16-17, 108-09). However, the banner test was a well-known and frequently used simulation designed to ensure safe locomotive operation. (Doc. # 35-11 at 7). It is obviously consistent with the overall aim of the required tests

18

to subject train operators to banner tests. Indeed, Plaintiff had been subjected to banner tests before and even conceded that banner tests were a "focus of testing." (Doc. # 35-3 at 15-16). None of the purported suspicious circumstances regarding this particular banner test support a reasonable inference of a causal link between Plaintiff's protected activity and the banner test and his subsequent termination.

Smith testified that he did not know the identity of the employee he was testing on that particular night. Indeed, Smith testified that he typically did not know the identity of the employees he subjected to banner tests:

> I would have never had a reason to ask the yardmaster who was on the job. That's not how I -- how I perform my tests, and I'm going off of my career, my tenure as a manager and how I perform tests, I asked the yardmaster or dispatcher, you know, what trains are in the area. I don't ask who's on crews or nothing like that.

(Doc. # 31-15 at 23).

The undisputed fact is that Plaintiff was given a safety test that he failed. The record establishes that individuals without knowledge of his protected conduct made the decision to terminate his employment for this violation, which was his third. And, Plaintiff has not introduced any *evidence* to the contrary. Plaintiff cannot prevail by showing his employer acted unfairly toward him; rather, he must establish that his protected activity was a contributing factor in Defendant's decision to take an adverse personnel action against him. Plaintiff has not shown (1) that his protected activity played any part in Smith's decision to conduct the banner test or (2) that anyone involved in Defendant's decision to terminate his employment was even aware of his protected activity. Nor can Plaintiff use cat's paw liability to impute a retaliatory motive to Defendant.

Because Plaintiff has failed to present evidence sufficient to create a genuine issue of fact for a jury to resolve on the fourth element of his FRSA claim, Defendant is entitled to summary judgment on that claim.

### B.    Defendant's Affirmative Defense

Alternatively, Defendant argues that even if Plaintiff could establish that his protected activity was a contributing factor in the adverse employment action taken against him (something he has failed to do), it is entitled to summary judgment on its affirmative defense. If a plaintiff satisfies the four-element test to establish retaliation under the FRSA, the burden shifts to the defendant to show by clear and convincing evidence that it would have issued the same discipline regardless of the protected conduct. 49 U.S.C. § 42121(b)(2)(B)(iv); *see also Lax v. Illinois Cent. R.R. Co*., 2015 WL 12564218, at *2 (N.D. Miss. Apr. 23, 2015). "[T]his is a tough standard, and not by accident." *Araujo*, 708 F.3d at 159 (citing *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997)).

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden-the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Ctv., Md*., 2006 WL 2632298, at *5

(D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original). Because Defendant "bears of proof on its [affirmative defense] it must demonstrate that no reasonable juror could do other than find in its favor on the [affirmative defense]." *State Mut. Ins. Co. v. Gussenhoven*, 2018 WL 5085814, at *3 (N.D. Ga. Apr. 25, 2018).

Here, Defendant argues that it has presented evidence that shows that it would have taken the same action against Plaintiff for (1) the securement violation in November 2018 and (2) the banner test violation in January 2019. Defendant has presented evidence that Plaintiff was charged for the securement violation in the same manner that other employees were charged for the same kind of violation. (Doc. # 31-4 at 83-164). The securement violation was the second serious offense on Plaintiff's active record. (Doc. # 31-4 ¶ 5). Plaintiff proceeded to a hearing on the violation, at which he admitted to his violation and was found guilty. (Doc. # 31-13 at 22-23). According to CSX policy, because the securement violation was Plaintiff's second non-major offense, Defendant imposed a three-day suspension. (*Id.*).

The evidence shows that Plaintiff's dismissal followed a similar pattern. Plaintiff was charged with using the emergency brake to stop short of the banner, just as several other employees had been. (Doc. # 43-1 ¶ 3-4). This was Plaintiff's third non-serious offense. Pursuant to CSX policy, after he was found guilty at the hearing, a disinterested manager recommended his termination (Doc. # 31-2 ¶ 13), and he was dismissed by his general manager. (Doc. # 31-8 ¶ 10).

Defendant has presented evidence that it treated Plaintiff and other similarly situated employees consistently. Thus, Defendant has presented evidence from which it *could be* inferred that it would have issued the same discipline even in the absence of any protected activity in

which Plaintiff engaged. However, the affirmative defense only comes into play if an employee proves that his protected activity was a contributing factor in the adverse personnel action. Under that circumstance, to succeed on the defense the employer is required to prove -- by clear and convincing evidence -- that it would have made the same decision regardless of its retaliatory motive. As it turns out, the issue is academic here given that, for the reasons already noted, Plaintiff has not shown any retaliation by Defendant. But, if Plaintiff had made such a showing, or created a material issue of fact for a jury to decide, on this record a summary judgment ruling in Defendant's favor on the defense would require the court to make a credibility determination regarding Defendant's witnesses' testimony. Obviously, under Rule 56, the court cannot make credibility determinations. Credibility issues are emphatically in the province of a jury. Therefore, the evidence regarding Defendant's affirmative defense would not provide an alternate basis to grant Defendant's Motion for Summary Judgment.

## IV. Conclusion

Because Plaintiff has failed to present evidence raising a genuine issue of material fact on all of the elements of his FRSA claim, Defendant is entitled to summary judgment on that claim. Therefore, Defendant's Motion for Summary Judgment is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this May 11, 2023.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

DOCKET/TAB #

46

FILED

2023 May-11  PM 05:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JEREMY HITT, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  2:21-CV-1720-RDP** |
| | } | |
| CSX TRANSPORTATION, INC., | } | |
| | } | |
| **Defendant.** | } | |

**ORDER**

In accordance with the accompanying Memorandum Opinion, Defendant's Motion for Summary Judgment (Doc. # 26) is **GRANTED**. Plaintiff's claim against Defendant is **DISMISSED WITH PREJUDICE**.

The Clerk of Court is **DIRECTED** to close this case.

Costs are to be taxed against Plaintiff.

**DONE** and **ORDERED** this May 11, 2023.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

DOCKET/TAB #

49

FILED
2023 Jun-06  PM 01:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEREMY HITT,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **Plaintiff,** | ) | |
| | ) | **2:21-CV-1720-RDP** |
| **vs.** | ) | |
| | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>NOTICE OF APPEAL</u>

COMES NOW Plaintiff Jeremy Hitt, by and through his counsel of record, and hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the District Court's Order (Doc. #46) and Memorandum Opinion (Doc. #45) granting summary judgment and dismissing the case entered May 11, 2023.

**BURGE & BURGE, P.C.**

/s/ F. TUCKER BURGE, JR.
F. TUCKER BURGE, JR.
F. TUCKER BURGE, SR.
2001 Park Place, Suite 1350
Birmingham, AL   35203
(205) 251-9000
(205)323-0512 (Facsimile)
Email:  ftbjr@burge-law.com
                tucker@burge-law.com

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of June, 2023, I electronically filed the above and foregoing document with The Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record via the Court's electronic filing system

/s/ F. TUCKER BURGE, JR.

OF COUNSEL
