[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11899

_____

JEREMY HITT,

                                              Plaintiff-Appellant,

*versus*

CSX TRANSPORTATION, INC.,

                                              Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cv-01720-RDP

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

Jeremy Hitt, who operated trains for CSX Transportation, Inc., got into a dispute with a supervisor because he refused to work during unsafe conditions in a lightning storm. He asserts that he was fired several months later for receiving his third and final strike with the company after he failed a safety test run by that same supervisor, who he alleges targeted him for his refusal to work during the lightning storm. Hitt alleges that, in doing so, CSX violated the Federal Railroad Safety Act (FRSA), which protects railroad employees from retaliation for safety-related whistleblowing. *See* 49 U.S.C. § 20109(a)–(c). CSX counters that there is no evidence that the lightning incident was a contributing factor to the test or termination. CSX is right. The district court correctly concluded that Hitt failed to establish his claim because he failed to provide sufficient evidence of causation at summary judgment. Therefore, we affirm the district court's grant of summary judgment to CSX.

I.

Jeremy Hitt was a Remote Control Operator at CSX's Boyles Yard in Birmingham.[1] Hitt was fired after receiving three workplace violations, specifically "non-major" offenses—which are also

---

[1] We recount the facts as they appear in the record at summary judgment.

23-11899               Opinion of the Court                3

referred to as "serious" offenses at CSX. A non-major offense is a rule violation "that do[es] not result in derailment or damage to equipment and that [is] not otherwise identified individually" as a major offense. Dist. Ct. Doc. 35-10 at 45. An employee may be fired for committing three non-major (serious) offenses in a three-year period.

In 2017, Hitt received a workplace violation for failing to leave unattended train cars at a location specified in his instructions. This violation was Hitt's first strike.

In the summer of 2018, Hitt had an incident in which he refused Trainmaster Nick Smith's instructions to return to work during the end of a lightning storm. Hitt didn't work where Smith did most of the time, but Smith was Hitt's superior. During the incident, Hitt stated that CSX's policy required waiting 30 minutes after a lightning storm to return to work; and Smith nonetheless tried to force Hitt to go back to work before that. These initial conversations were carried out over three phone calls. Then, about 45 minutes into the work stoppage because of the lightning, Smith drove over to the office in which Hitt and his colleagues were waiting out the weather and told them again to go back out to the trains. Hitt says that he told Smith that they had "about 15 minutes left according to the rule" and that they were ready to go right after that. Dist. Ct. Doc. 35-3 at 10. Hitt says that Smith kept reiterating that they had to go right then because a weather-tracking application he had said the lightning was far enough away for it to be safe. Hitt says that it ended with his refusal to go back to work even in

the face of Smith threatening to relieve Hitt of his duty if he didn't listen and get back to work. At that point, Smith just responded "[o]kay" and drove away. *Id.*

During this same incident, Smith pressured Hitt and the others to make up for lost time by going faster. Hitt said that a safe speed was seven miles per hour and that the remote speed goes straight from seven to ten miles per hour—there is nothing between. Thus, Hitt understood Smith to be pressuring him to go ten miles per hour. Hitt, however, told Smith specifically that he would still go seven miles per hour, which he thought was the safe speed.

Hitt was never formally charged within the company for any violation directly related to the lightning events.

On November 25, 2018, CSX Trainmaster Joshua Hiers discovered that Hitt had failed to secure his train properly when he left his train for about seven or eight minutes to use a restroom that was not on the train rather than the purportedly "disgusting" restroom on the train. Hiers reported Hitt. Hitt received a securement charge for failing to secure his equipment to leave it unattended. On January 17, 2019, Hitt had his securement charge hearing. Smith participated in that hearing as the hearing officer—the CSX manager conducting the hearing and questioning the witnesses—and found that Hitt had admitted to the rule violation; but Smith did not put down the bathroom reason as a mitigating factor, leaving the mitigating factors section of the hearing officer findings form blank. Thus, Hitt had received his second violation—with CSX formally completing the process when it notified him on

February 15, 2019, that he was receiving a three-day suspension for the violation.

On January 21, 2019, Smith engaged in an allegedly retaliatory banner test of Hitt. A banner test simulates an unforeseen obstruction to the track like a car, men or equipment, or anything else that could hinder the train's movement on the track or cause a safety hazard. The "banner" is a two-to-three-foot device with two red flags, a flashing red light, and reflective striping; it is placed on the track. A banner test was not one of the operational tests that CSX managers like Smith were required to perform on employees during the first quarter of 2019; but managers regularly perform non-mandatory operational tests to ensure safe train operation practices, banner tests are common, and Hitt was given one about once a year.

The day of the banner test, Trainmaster Nick Smith went to the trainyard where Hitt worked with an operational rule test team, including Assistant Superintendent Brandon Hinton and Trainmaster Donovan Boyles, a new trainmaster. The goal of operational tests is to help crews learn to work safer, and doing them in test teams helps managers learn from each other. This test team's purpose was to conduct operational tests of train crews as a group so that Boyles could learn how to conduct and record operational tests better.

According to Donovan Boyles, before going to the trainyard where Hitt worked on January 21, Smith and the test team performed operational tests that day at other train yards. The test team

drove around together and worked together for these earlier tests; but after a group lunch that they attended with two vehicles, Smith split off from Donovan Boyles and Hinton to drive to the trainyard where Hitt worked in Birmingham. Smith arrived there as early as 4:01 P.M. But Smith did not rejoin the test team per the original plan.

Donovan Boyles and Hinton performed two tests: one around 6:50 P.M. of two individuals—Mr. Howard and Mr. Canada—and one between 6:45 and 7:15 P.M. of Hitt. Smith didn't participate in these tests, and Donovan Boyles's understanding at that time was that Smith was performing tests in a different part of the trainyard than the other two managers.

Boyles and Hinton's operational test of Hitt was a shoving movement test. Between 6:45 and 7:15 P.M., Hitt gathered railcars in the south receiving yard in preparation of pulling them to the departure yard's western tracks. During this time, Hitt spoke with Yardmaster Robert Gandy multiple times over the radio about his current and future train movements.

Smith knew that the Y293—the engine Hitt was moving—would encounter the banner before he placed it because he had spoken with the yardmaster about setting up the banner test. But Smith testified in his deposition that he did not know that Hitt was on the Y293 before setting up the banner test. After Smith set up the banner test, Smith listened to the radio, while waiting for the Y293: "I'd set the banner up, had sat there and waited, was listening to the radio, listening to some movements that were made." Dist.

23-11899               Opinion of the Court                7

Ct. Doc. 35-1 at 8. Based on listening to the radio, Smith heard—as he later recalled—that "the 293 job had made a move in the south yard and was getting ready to pull into the west yard." *Id.*

While waiting, Trainmaster Smith also sent text messages to CSX Safety Operating Practices Manager Tony Thomas asking about the disciplinary actions to take if an employee struck a banner:

> Smith: If someone hits a banner[,] do you pull them out of service[?] In a yard track?
>
> Smith: Josh and I have one set up[,] and it's a tough test for the employee we are testing[.]
>
> Thomas: No[.]
>
> Smith: It's a serious[,] right?

Dist. Ct. Doc. 35-13 at 37. Trainmaster Josh Hiers was the only supervisor named "Josh" in the trainyard where Hitt worked.

After Hitt finished gathering the cars, Yardmaster Gandy instructed him to proceed to the departure yard into Track 6 West and drop the cars off at the north end of the track. Gandy got the track switches lined up for Hitt's movement—a sign that Track 6 West was clear. Hitt made the movement at seven miles per hour, less than half the new maximum restricted speed at that trainyard of fifteen miles per hour when operating through a power-operated switch. He was pulling 20 railcars, so he did not have air on the cars—which would have allowed him to use the train's air brakes—

because that was the customary practice with that number of railcars in the yard.

Having already set up the banner, Smith performed a banner test on Hitt around 7:20 P.M—Smith's only operational test that day at the trainyard where Hitt worked and the first banner test that Smith had performed on a Remote Control Operator like Hitt at that trainyard. Hitt saw Smith's set up banner from about three or four car lengths away. Hitt then turned the brake knob to emergency (i.e., initiated the emergency brake). Hitt stopped short of the banner—about two to three car lengths away. There was no derailment, equipment damage, or severe slack change. According to Justin Roper who worked for twenty years as an RCO at the trainyard where Hitt worked, the slow speeds and limited number of cars involved in switching operations at that trainyard do not generate enough slack forces for an emergency brake application to cause a derailment or equipment damage. Likewise, Hitt stated that he knew from experience that there was no danger of that occurring when he used the emergency brake.

According to Hitt, after Hitt stopped, Trainmaster Smith approached the locomotive and complimented Hitt on stopping before the banner. Smith asked if he had used the emergency mode to stop, and Hitt said he had. Smith then asked if Hitt had air on the cars—to which Hitt responded "no."

Hitt later testified in his deposition that he wouldn't have been able to stop beyond the minimum failing distance (within half the range of vision) without applying the emergency brake. Hitt

said that he probably couldn't have stopped without the emergency brake even if he had put air on the cars; and in any case, Hitt stated that he didn't know of anyone who put air on the cars during switching at the trainyard where he worked because it wasn't necessary with such little tonnage and so few train cars attached.

After Hitt responded about not putting air on his cars, Smith then told Hitt to proceed with his assignment and moved the banner, giving Hitt a thumbs up motion. About 15 minutes later, the yardmaster instructed Hitt to pull the engine into the pocket track—where CSX employees put the engines when they take a break—where he was met by Trainmaster Smith. Smith told Hitt that he was being removed from service and charged because he failed the banner test by using the emergency function to stop. Although Trainmaster Smith did not dispute that Hitt stopped within half his range of vision, he told Hitt that using the emergency brake violated a CSX rule. Hitt then asked Smith why Smith hadn't told him earlier because Hitt's understanding of banner tests was that failing meant you needed to immediately be taken out of service and because he had never seen anyone fail a banner test and not be told immediately. Smith had no response but to repeat that Hitt had broken the rule about using the emergency brake.

Hitt asked Smith which rule states that using the emergency brake in response to a banner test is prohibited. Smith didn't have an immediate answer; but after driving Hitt to an office, Smith showed him CSX's Operating Rule 300.4 and said that it is "implied that . . . you can't use [the] emergency" brake, Dist. Ct. Doc. 35-3

at 28, because it could cause a disaster "if you're going down the main line with 100 cars[] [at] 50 miles an hour," Dist. Ct. Doc. 35-1 at 52. Rule 300.4 provides that trains not on "main or signaled tracks must move at a speed that permits stopping within one-half the range of vision, short of a train, a car, on-track equipment, an obstruction, a Stop signal, a derail, or an improperly lined switch and must not exceed" a specified speed that depends on the circumstances. Dist. Ct. Doc. 31-2 at 17.

In any event, the CSX hearing officer at Hitt's third violation hearing, Gary Adkins, determined that using the emergency brake—which Hitt admitted to doing—established that Hitt was not operating at an appropriate speed. Notably, CSX has disciplined other people when they stopped with the emergency brake. CSX provided evidence that from May 2016 through January 2020, it charged at least seven employees besides Hitt with rule violations for using the emergency brake to stop during a banner test. Indeed, Adkins's declaration states that it has always been his view that using the emergency brake during a banner test establishes poor train handling and operation at an improper speed.

Adkins's findings were then sent to CSX Superintendent Michael Dilday, who recommended that Hitt be dismissed because this was his third non-major (serious) offense in three years. In response, a CSX Senior Manager in the Labor Relations department, Katrina Donovan, suggested a 30-day unpaid suspension instead of a dismissal—even though she agreed that dismissal was justified. Donovan was concerned that the outcome of a parallel arbitration

proceeding about Hitt's second non-major offense could present some issues if Hitt were dismissed for his third strike but then had his second offense overturned. Dilday disagreed and insisted that a dismissal was appropriate. Because they disagreed, they consulted the General Manager of the Southwest Region, Willis John Layne, who agreed with Dilday that Hitt should be dismissed.

Adkins, Dilday, Donovan, and Layne each submitted sworn declarations—that Hitt doesn't dispute or oppose with contrary evidence—stating that they didn't know about Hitt's refusal to work during the lightning storm or Hitt's refusal to run the train at more than seven miles per hour. Ultimately, just as CSX had terminated at least five other employees who committed three non-major offenses in three years, CSX terminated Hitt.

Hitt filed suit under the FRSA, and CSX moved for summary judgment. The district court concluded that Hitt could not establish that his protected activity was a contributing factor in the adverse employment action against him and thus couldn't prove the elements of his claim at trial. Because Hitt couldn't establish all four elements of his claim, the district court granted summary judgment to CSX. Hitt appealed.

## II.

We review a grant of summary judgment *de novo*. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (citing *Rojas v. Florida*, 285 F.3d 1339, 1341 (11th Cir. 2002)). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12                    Opinion of the Court                    23-11899

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (cleaned up); *see also* Fed. R. Civ. P. 56.

### III.

We first address the FRSA's statutory framework and establish the test for analyzing FRSA claims. Applying that framework to the facts, we conclude that Hitt fails to establish the element of causation.

### A.

The FRSA provides whistleblower protections for railroad employees. *See* 49 U.S.C. § 20109(a)–(c). The FRSA prohibits railroad carriers from "discharg[ing], demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing] against an employee if such discrimination is due, in whole or in part, to" the employee participating in a protected activity. 49 U.S.C. § 20109(a). The FRSA allows enforcement actions for alleged violations of these whistleblower protections. *See id.* § 20109(d)(1). For these enforcement actions, the FRSA incorporates the standards of proof from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21). *See id.* § 20109(d)(2)(A)(i) ("Any action brought under [49 U.S.C. § 20109](d)(1) shall be governed by the legal burdens of proof set forth in section 42121(b)."). Under the AIR 21 framework, a plaintiff bears the burden of establishing that his protected activity was a contributing factor to an adverse employment action. *See id.* § 42121(b)(2)(B)(iii); *accord id.*

23-11899               Opinion of the Court                    13

§ 42121(b)(2)(B)(i). Therefore, to prove a claim under the FRSA, an employee must establish by a preponderance of the evidence that (1) he engaged in a protected activity; (2) the railroad knew, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse employment action; and (4) the protected activity was a contributing factor in the adverse action. *See id.* § 20109(d)(2)(A)(i); *id.* § 42121(b)(2)(B)(iii); 29 C.F.R. § 1982.109(a); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 160 (3d Cir. 2013).

If the plaintiff meets this burden, an employer may still avoid liability by establishing an affirmative defense. Specifically, an employer must establish by clear and convincing evidence that, even though protected activity contributed to its decision, it would have taken the same adverse employment action in the absence of the protected activity. *See* 49 U.S.C. § 42121(b)(2)(B)(iv); *accord id.* § 42121(b)(2)(B)(ii); *see also* 29 C.F.R. § 1982.109(b).

Other statutes have the same legal standards. Both the Surface Transportation Assistance Act of 1982 and the Sarbanes-Oxley Act of 2002 expressly incorporate the AIR 21 burdens just as the FRSA does. *See* 49 U.S.C. § 31105(b) (Surface Transportation Assistance Act); 18 U.S.C. § 1514A(b)(2)(C) (Sarbanes-Oxley). Because these statutes have the same legal burdens of proof as the FRSA, proving an FRSA claim works the same way as proving a claim under these statutes. *See Ronnie v. Off. Depot, LLC*, 81 F.4th 1345, 1350 (11th Cir. 2023) (describing the burden and elements of a Sarbanes-Oxley claim).

Recently, the U.S. Supreme Court interpreted these standards in *Murray v. UBS Securities, LLC*, 601 U.S. 23 (2024)—a securities case involving Sarbanes-Oxley. *See id.* at 27 (citing 18 U.S.C. § 1514A(b)(2)(C)). Both *Murray* and the parties in this case focus on the "contributing factor" element. *See id.* at 26 (quoting 49 U.S.C. § 42121(b)(2)(B)(iii)). An employee's protected conduct is a "contributing factor" to an adverse action "[w]hen an employer treats someone worse—whether by firing them, demoting them, or imposing some other unfavorable change in the terms and conditions of employment—'because of' the employee's protected [] activity." *Id.* at 34–35. To meet the contributing factor standard, an employee "need not [] prove that his employer acted with 'retaliatory intent'"—"something akin to animus." *Id.* at 32–33. Instead, the employee must prove its employer's "intent to take some adverse employment action against the [] employee 'because of' his protected [] activity." *Id.* at 35. In other words, the employer must have made "an intentional choice in which that factor play[ed] some role in the employer's thinking." *Id.* at 40 (Alito, J., concurring).

## B.

We now apply these standards to the facts of this case. All agree that Hitt engaged in protected activity and that he suffered an adverse action, but CSX argues (and the district court ruled) that Hitt's protected activity did not contribute to his termination. We agree. The evidence at summary judgment establishes that Hitt engaged in protected activity by refusing to work during the lightning storm and refusing to operate at speeds he considered unsafe and

that he suffered an adverse action by being terminated. But there is no evidence that these actions were a contributing factor to CSX's decision to terminate him. That is, there is no reason to think that these activities played a role in CSX's thinking about why Hitt should be terminated.

Hitt's theory of causation is based on a chain of events that starts with Smith. Hitt contends that he engaged in protected activity by refusing Smith's orders to work during the lightning storm and refusing to operate the train too quickly after it ended. He argues that this incident upset Smith and that Smith retaliated by giving him the banner test that he failed. Hitt argues that the termination from failing the banner test was, therefore, caused by his protected activity—even if the people who ultimately fired him didn't know about the protected activity.

Hitt's theory of causation fails for two reasons. First, no reasonable jury could conclude that Hitt's protected activity—i.e., his refusal to work during the lightning storm or operate at speeds he considered unsafe right after it ended—contributed to his supervisor's decision to conduct the banner test in the first place. Second, even if Hitt's supervisor conducted the banner test as retaliation, his protected activity was not a contributing factor to CSX's separate decision to terminate his employment. That is, his ultimate termination was not "due, in whole or in part, to" his protected activity. 49 U.S.C. § 20109(a). We will discuss each reason in turn.

1.

Although Hitt argues that the circumstances surrounding his banner test were suspicious, a jury would merely be speculating if it were to conclude that he was tested because of his protected activity. For starters, there is no good reason to believe that the supervisor even knew he was testing Hitt when he conducted the test. The evidence establishes that Smith knew that he was testing the Y293 engine before setting up the banner. And the record establishes that Smith listened to the radio and could have recognized Hitt's voice to know Hitt was operating the Y293 before Hitt ran into the banner and failed the test. But there is no evidence that Smith knew Hitt was on the Y293 engine *before* he set up the banner test for that engine. And there is in fact evidence in the record that Smith didn't know Hitt was on the Y293 before setting up the banner: Smith's deposition testimony.

There is also nothing that links Smith's decision to test Hitt with Hitt's protected activity several months earlier. In the Title VII retaliation context, we have held that "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798–99 (11th Cir. 2000)). But "mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "A three to four month disparity between the statutorily protected expression and the adverse

employment action is not enough" to establish causation from temporal proximity. *Id.* (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 273). Hitt engaged in protected activity in the summer of 2018, and the banner test was administered on January 21, 2019. Construing the facts in Hitt's favor by assuming the lightning incident happened on the last day of summer in September 2018, Hitt has a four-month gap between the protected activity and the allegedly retaliatory banner test. Given this several month gap, we cannot say that the temporal proximity between the protected activity and the test is enough for Hitt to survive summary judgment on causation. *See id.*

Finally, the record does not reflect that there was anything extraordinary about Smith's decision to conduct a banner test. CSX managers regularly perform discretionary operational tests to encourage safe train operation among employees. Smith tested Hitt as part of an organized effort with a group of other CSX employees that were going from trainyard to trainyard testing employees, and other members of that group also tested Hitt. A banner test is a routine test, and this test was applied to Hitt just as it was applied to others. There is no evidence to link Smith's decision to perform the test with Hitt's protected activity.

2.

Hitt's causation theory fails for a second reason. Even if the record established that Smith conducted the test to retaliate against Hitt, no reasonable jury could conclude that Smith's reason for conducting the test carried through to CSX's reason for *terminating*

Hitt. The undisputed fact is that Hitt was fired for failing a safety test, not for any other reason. CSX presented evidence that it charged Hitt with violating CSX's rules because he used the emergency brake to stop the train short of the banner. And CSX presented evidence that it terminated his employment because this was his third non-major (serious) offense in a three-year period, which was consistent with CSX's policies and past practices. Indeed, CSX provided evidence that it disciplined several other employees who failed banner tests the same way as Hitt and that it terminated other employees who committed three non-major offenses in a three-year period.

There is no evidence that Hitt's protected activity played any role in CSX's decision-making process. *See Murray*, 601 U.S. at 32–37. None of the decision-makers knew about Hitt's protected conduct. Smith, the allegedly biased supervisor, had no control over the termination decision. CSX's investigation into the incident did not consider any arguably biased report from Smith. The key decision-makers separately determined that the fact that Hitt used the emergency brake during the banner test, which Hitt admitted during his internal company hearing, meant that Hitt violated CSX's rules and should receive his third offense in three years. And they independently determined that he should be fired for that third offense.

Hitt tries to impute his supervisor's alleged motive to CSX through the cat's paw theory. But even assuming the cat's paw theory applies to the FRSA statutory framework, the cat's paw theory

doesn't help Hitt establish causation here. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420–22 (2011) (applying the cat's paw theory to a similar statute). "A cat's-paw argument requires evidence that the ultimate (and manipulated) decisionmaker—the puppet—'followed the biased recommendation' of another—the puppeteer—'without independently investigating the complaint against the employee.'" *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999)). There is no evidence of a manipulated decisionmaker here. Instead, it is undisputed that Hitt's allegedly biased supervisor had no influence over the termination decision-making process. Because CSX's decision was independent of Smith, Hitt cannot use the cat's paw theory of liability to help him establish causation.

★    ★    ★

Hitt cannot establish that his protected activity was a contributing factor in his termination as the statute requires. *See* 49 U.S.C. § 20109(d)(2)(A)(i); *id.* § 42121(b)(2)(B)(iii). The district court was right to conclude that Hitt cannot establish the elements of an FRSA claim.

## IV.

We **AFFIRM** the district court's grant of summary judgment to CSX.

23-11899　　　　　　JORDAN, J., Concurring　　　　　　1

JORDAN, Circuit Judge, Concurring:

　　I join all of the court's opinion except for Part III.B.1. Viewing the evidence in the light most favorable to Mr. Hitt, I'm not sure that Part III.B.1 is correct. But even if Part III.B.1 is right, it is unnecessary given the analysis and conclusion in Part III.B.2.